481 A.2d 1314

**COMMONWEALTH of Pennsylvania**

v.

**Everett E. SHIREY, Appellant. (Three cases).**

Superior Court of Pennsylvania.

Argued Feb. 18, 1982.

Filed Sept. 7, 1984.

Petition for Allowance of Appeal Denied Feb. 5, 1985.

86

92

94

Dante G. Bertani, Public Defender, Greensburg, for appellant.

Perry S. Patterson, Deputy Attorney General, Coudersport, for Com., appellee.

Before JOHNSON, MONTEMURO, and MONTGOMERY, JJ.

MONTEMURO, Judge:

This matter is before the court on three consolidated appeals of Everett Shirey from judgments of sentence involving five different criminal complaints. To both comprehend and compartmentalize these various appeals, a thorough understanding of the procedural history of the case is required.

On January 26, 1980, the appellant was arrested on charges under four separate criminal actions docketed in Potter County. These four actions were as follows: (1) at No. 28 of 1980, appellant was charged with indecent assault,[1] indecent exposure,[2] and corruption of a minor,[3] said charges pertaining to appellant's alleged conduct towards *Michelle Renee Marshall,* age nine years; (2) at No. 29 of 1980, appellant was charged with indecent assault and corruption of a minor, said charges pertaining to appellant's alleged conduct towards *Bobbi Jo Marshall,* age eleven years; (3) at No. 30 of 1980, appellant was charged with indecent assault, indecent exposure, and corruption of a minor, said charges pertaining to appellant's alleged conduct towards *Joy Michelle Paucke,* age eight years; and (4)

1. 18 Pa.C.S. § 3126.

2. *Id.* § 3127.

3. *Id.* § 3125, repealed and reenacted as § 6301.

at No. 31 of 1980, appellant was charged with indecent assault and corruption of a minor, said charges pertaining to appellant's alleged conduct towards *Julie Lynn Marshall*, age thirteen years. A preliminary hearing on these four criminal complaints was held on February 8, 1980, and appellant was bound over on all the charges.

On February 13, 1980, the appellant was arrested on a fifth set of charges. At No. 44 of 1980, appellant was charged with statutory rape,[4] indecent assault, indecent exposure, and corruption of a minor, said charges pertaining to appellant's alleged conduct towards *Pamela Sue McMillan*, age less than fourteen years. A preliminary hearing on No. 44 was held on February 19, 1980, and a prima facie case was found to exist on all the charges.

The Commonwealth presented motions to consolidate No. 28 with No. 30, and No. 29 with No. 31, for the purpose of trial. The appellant objected to consolidation and argued in the alternative that Nos. 28, 29, 30, and 31 be combined in one trial. The lower court granted the consolidation motions as requested by the Commonwealth.

Trial was held on Nos. 28 and 30 on May 15 and 16, 1980. The jury was unable to reach a verdict, and the lower court declared a mistrial on May 16, 1980. Trial of these actions was rescheduled.

On July 10 and 11, 1980, trial was held on Nos. 29 and 31. The jury returned a verdict of guilty on each of the two corruption of minors charges. After denial of appellant's motions for a new trial and in arrest of judgment, the lower court imposed sentence. Appellant has filed a timely appeal from this judgment of sentence.

On July 16 and 17, 1980, trial was held on No. 44. A verdict of guilty was rendered on three of the four charges: statutory rape, indecent assault, and corruption of a minor. The appellant's post trial motions were denied and sentence was imposed. Appellant has appealed from this judgment of sentence.

**4.** 18 Pa.C.S. § 3122.

On September 8, 1980, jury selection was held for the retrial of Nos. 28 and 30. Appellant's counsel was not present at that proceeding because of a commitment in another case, and appellant's motion to continue the jury selection was denied. The jury was chosen with appellant acting *pro se.*

On October 22 and 23, 1980, retrial was held on Nos. 28 and 30. A verdict was reached by the jury finding appellant guilty on each of the two indecent exposure charges, as well as each of the two corruption of minor charges. Motions for a new trial and in arrest of judgment were denied and sentence was imposed. A timely appeal was filed from the judgment of sentence.

Before us, therefore, are appeals from: the judgment of sentence on Nos. 28 and 30, the judgment of sentence on Nos. 29 and 31, and the judgment of sentence on No. 44. While several of the issues raised in these three appeals overlap, each appeal is unique. We proceed, therefore, to examine each appeal individually.

## I. APPEAL FROM NOS. 28 AND 30.

Appellant raises six issues as well as several sub-issues in this appeal. Those general issues concern: (1) selection of the jury in the absence of appellant's counsel, (2) selection of the jury six weeks prior to the trial, (3) alleged defective nature of the informations, (4) failure to consolidate all the offenses, (5) characterization of certain materials as "dirty" and "obscene", and (6) instructions to the jury. While resolution of the first issue requires the granting of a new trial, we find that issues (2) through (5) must still be addressed as they will undoubtedly recur upon retrial. Accordingly, we consider these issues seriatim.

### 1. Jury Selection in the Absence of Counsel.

Appellant argues that his fundamental right to counsel under the United States Constitution was violated by the trial court's requirement that he select the jury without the assistance of counsel. Selection of the jury was scheduled for September 8, 1980. During the week prior to that date,

appellant's counsel, Dante Bertani, communicated with the trial judge by phone and indicated that he would be trying a murder case in another county on that date. Bertani stated that he would contact John Duvall, a local Coudersport attorney, and request that he represent appellant during jury selection.

On September 8, 1980, Mr. Duvall appeared with appellant. Duvall reported that he was not there to represent the appellant but was there only to object to selection of the jury in Bertani's absence.[5] Thereupon, Duvall "withdrew", and the trial judge held a conference with the assistant district attorney and the appellant. The following exchange took place:

THE COURT: .... we will no[w] go in and draw the jury. Do you understand how to draw the jury?

MR. SHIREY: Might I now make that formal appeal to be postponed?

THE COURT: It is on the Record, but we are going to draw the jury today, none the less.

MR. SHIREY: I will do my best.

THE COURT: You will not be waiving your objection to drawing the jury today by virtue of doing so. But we are going to draw a jury today. That's definite and that's it. But you are not waiving your right to legally object.

MR. SHIREY: I understand.

N.T. September 8, 1980, at 6–7. Upon return to the courtroom, the trial judge conducted the voir dire examination,[6] and then the assistant district attorney and the appellant exercised their peremptory challenges. The members of the jury were announced and court adjourned.

Before the commencement of trial on October 22, 1980, Bertani took an exception to the entire jury because of its

5. Duvall also presented an objection to retrial on double jeopardy grounds.

6. Under Pa.R.Crim.P. 1106(d), the judge may conduct the examination of the prospective jurors. Here, the examination of the panel by the judge was not transcribed, so we do not know the extent of that examination or whether any panel members were excused for cause.

selection by appellant without assistance of counsel. The trial judge responded that the court had adjusted its calendar to accommodate Bertani's schedule on many occasions throughout the various criminal proceedings against appellant and that the court's interest in regulating its calendar outweighed counsel's availability problems. In its opinion denying appellant's post trial motions, the lower court employed a balancing test with the court's need to conduct its business with dispatch on one hand, and a criminal defendant's need to be afforded due process on the other. The lower court then determined that since it was not notified of the conflict at the earliest possible date, and since counsel had already been granted numerous continuances and changes of scheduling, the balance fell against the appellant's due process concerns.

The Sixth Amendment to the United States Constitution provides that "In all criminal prosecutions, the accused shall enjoy the right ... to have the Assistance of Counsel for his defence." The right to counsel applies to the states via the due process clause of the Fourteenth Amendment. *Gideon v. Wainwright,* 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963). The right inheres in all criminal prosecutions where a defendant's loss of liberty is at stake, *Argersinger v. Hamlin,* 407 U.S. 25, 92 S.Ct. 2006, 32 L.Ed.2d 530 (1972); and specifically attaches at all "critical stages" of the proceedings against the accused, *United States v. Wade,* 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967). The Sixth Amendment right to counsel is a fundamental right and is essential to a fair trial. *Gideon v. Wainwright, supra.*

The issue presented here is whether the process of jury selection constitutes a "critical stage" of the prosecution during which appellant was entitled to the assistance of counsel. While other states have answered this question in the affirmative, *Eason v. State,* Tex.Cr.App., 563 S.W.2d 945 (1978); *People v. Locklar,* 84 Cal.App.3d 224, 148 Cal.Rptr. 322 (1978); there is no binding precedent in this Commonwealth to direct our resolution of this question.

104

A "critical stage" of the prosecution has been defined as "any stage of the prosecution, formal or informal, in or out of court, where counsel's absence might derogate from the accused's right to a fair trial." *United States v. Wade, supra,* 388 U.S. at 226, 87 S.Ct. at 1932. The thrust of the right to counsel is the entrustment of the right to a fair trial. Thus, counsel's presence at "critical stages" of the proceedings is mandated because "counsel's legal training and expertise may then be employed on behalf of the accused to observe, discover and prevent possible unfairness or irregularity in ... procedures which may later irreparably prevent a basically fair determination of guilt or innocence." *United States ex rel. Stukes v. Shovlin,* 329 F.Supp. 911, 913 (E.D.Pa.1971), *aff'd.,* 464 F.2d 1211 (3d Cir.1972). We are required, therefore, to scrutinize the designated proceeding to determine whether the presence of counsel is necessary to preserve an accused's basic right to a fair trial. This inquiry calls upon us to analyze whether potential substantial prejudice to an accused's rights inheres in the particular proceeding and whether counsel would have the ability to help avoid that prejudice. *United States v. Wade, supra.*

■ The right to a fair trial requires a fair tribunal. *In re Murchison,* 349 U.S. 133, 75 S.Ct. 623, 99 L.Ed. 942 (1955). The Sixth Amendment to the United States Constitution guarantees a criminal defendant the right to be tried "by an impartial jury", and this guarantee applies to the states through the due process clause. *See Commonwealth v. Brown,* 231 Pa.Super. 431, 332 A.2d 828 (1974). Voir dire has been described as a "crucial stage" in a criminal proceeding, *Commonwealth v. Christian,* 480 Pa. 131, 135, 389 A.2d 545, 547 (1978);[7] since its purpose is to secure a "competent, fair, impartial and unprejudiced jury." *Commonwealth v. Futch,* 469 Pa. 422, 426, 366 A.2d 246, 248 (1976). It is beyond doubt, therefore, that the potential

7. *Commonwealth v. Christian* did not characterize voir dire as "crucial" in the sense that it was a "critical stage" of the prosecution which would require the assistance of counsel, but was concerned only with the trial court's restriction of questions on voir dire.

for substantial prejudice is intrinsic to the jury selection process.

The responsibility of obtaining an impartial jury must be shared by the trial court and respective counsel. *Commonwealth v. Christian, supra.* In pursuit of this goal, prospective jurors are examined and counsel are afforded an opportunity to determine juror qualifications as well as establish a basis for the effective exercise of peremptory challenges. *Id.* A litigant has the right to probe into a prospective juror's bias or any other subject which bears on the impartiality of a prospective juror. *Commonwealth v. Futch, supra.* Upon such an examination, a challenge for cause may be voiced and a juror may be rejected on a narrowly specified, provable, and legally cognizable basis of partiality. *Swain v. Alabama,* 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965). Peremptory challenges play a necessary part in obtaining an impartial jury, in that their very availability "allows counsel to ascertain the possibility of bias through probing questions on the voir dire and facilities the exercise of challenges for cause by removing the fear of incurring a juror's hostility through examination and challenge for cause." *Id.* at 219–20, 85 S.Ct. at 835.

During the process of jury selection, important rights must be exercised or they are forever waived. An objection to a juror which constitutes good cause for challenge is waived if not made before the juror is sworn. *Commonwealth v. Aljoe,* 420 Pa. 198, 216 A.2d 50 (1966). The failure to elicit information which would have been available by questioning results in a waiver of the disqualification. *Commonwealth v. Sydlosky,* 305 Pa. 406, 158 A. 154 (1931).

Counsel, therefore, plays an active role in the jury selection process by observing, uncovering, and preventing unfairness. Through his legal training and expertise, counsel has the ability to help avoid the grave possibility of

prejudice inherent in the jury selection process.[8] Thus, we hold that jury selection is a "critical stage" of the prosecution against an accused which calls for the assistance of counsel. The denial of appellant's constitutional right to counsel at this critical stage constitutes error.[9]

Our inquiry does not end here, however, as we must now determine the appropriate remedy for this constitutional error. "Cases involving Sixth Amendment deprivations are subject to the general rule that remedies should be tailored to the injury suffered from the constitutional violation...." *United States v. Morrison*, 449 U.S. 361, 364, 101 S.Ct. 665, 668, 66 L.Ed.2d 564 (1981). The case law has reflected this approach in that the appropriate remedy for a particular violation of the right to counsel may be either: suppression of evidence obtained from an accused in the absence of his counsel, *id.;* reversal and remand for a new

8. It is not sufficient that the trial court accepted for itself the duty of voir dire examination: " 'Assuming that a court can adequately represent the defendant at any step of a contested criminal trial, that is not a substitute for, nor can it be taken in satisfaction of, the constitutional requirement that one charged with crime is entitled to the benefit of counsel who will devote his undivided energies solely and exclusively to the performance of these functions' " *United States v. Smith*, 411 F.2d 733, 736 (6th Cir.1969) (Quoting *Thomas v. Hunter*, 153 F.2d 834, 839 (10th Cir.1946)). Furthermore, the exercise of challenges is within the province of counsel, and courts should be reluctant to enter this aspect of the trial. *Commonwealth v. Fisher*, 447 Pa. 405, 290 A.2d 262 (1972).

9. The trial court's use of a balancing test was inappropriate. While we are sympathetic to a trial court's interests in regulating its calendar, this interest can never be paramount to a constitutional right of an accused:

We are aware and we sympathize with trial courts confronted with massive caseloads on the one hand and, on the other hand, the embarrassment of having to send venires home because suddenly there is no case to try. Trial courts must and do have a broad discretion in granting or denying trial continuances, but this discretion may not be exercised in such a manner as to impair fundamental rights of the accused.

*People v. Locklar, supra,* 84 Cal.App.3d at 231, 148 Cal.Rptr. at 325. However, in a civil matter where the assistance of counsel does not take on constitutional dimensions, the court's interest in the efficient administration of justice may very well take precedence. *See Marchyn v. Silva*, Tex.Civ.App., 455 S.W.2d 442 (1970).

trial upon a showing that such evidence admitted at trial was "harmful", *id.;* denial of a new trial and affirmance of a conviction where no "harm" was demonstrated, *id.;* and automatic reversal and remand for a new trial in some instances without the need to show "harm," *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); *White v. Maryland,* 373 U.S. 59, 83 S.Ct. 1050, 10 L.Ed.2d 193 (1963); *Gideon v. Wainwright, supra; Hamilton v. Alabama,* 368 U.S. 52, 82 S.Ct. 157, 7 L.Ed.2d 114 (1961); *Glasser v. United States,* 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942).

We find that automatic reversal and remand for a new trial is required. First of all, the suppression option is obviously not applicable here. Secondly, the remedies based on scrutiny of whether the error was "harmless" put a burden on the beneficiary of the error to prove beyond a reasonable doubt that the error did not affect the jury's verdict. *Chapman v. California, supra; Commonwealth v. Laws,* 474 Pa. 318, 378 A.2d 812 (1977). The constitutional error here, however, affects the *jury itself* and not merely whether their verdict could have been improperly influenced. While improper influence can be isolated, and its prejudicial impact considered in relation to other aspects of the trial, the degree of prejudice derived from jury selection in the absence of counsel can never be known. Thus, we cannot indulge in nice calculations as to the amount of prejudice arising from the denial of counsel at this critical stage of the prosecution, and so this constitutional violation mandates automatic reversal.

 Finally, the Commonwealth argues that, even recognizing that appellant had a right to counsel during the jury selection process, appellant waived this Sixth Amendment right. This contention is absurd. An accused may waive the right to assistance of counsel, although courts employ every reasonable presumption against waiver of fundamental constitutional rights. *Johnson v. Zerbst,* 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938). We need not engage in presumptions here, however, since appellant *ex-*

*plicitly* requested that jury selection be postponed so that he could have the assistance of his counsel, and the trial judge just as explicitly advised appellant that his objection was on the record and he would *not* be waiving that objection by participating in the drawing of the jury. N.T. September 8, 1980, at 6–7. Appellant's subsequent participation in the jury selection process did not effect a waiver of his right to counsel.

### 2. Selection of Jury Six Weeks Prior to Trial

■ Appellant's second contention of error concerns a practice in Potter County of selecting juries substantially in advance of trial. In this case, jury selection took place on September 8, 1980, while trial did not commence until October 22, 1980. Immediately prior to trial, the jury was sworn. The trial judge then asked the jurors whether any juror had received any information regarding the case between the time they were chosen and the present. N.T. of October 22, 1980, at 15. The trial judge asked for a show of hands in response to his question, and none of the jurors raised his hand.

Appellant asserts that since Potter County is a rural, sparsely populated county, there was considerable opportunity within the six week delay for outside influence to have reached the selected jurors. Thus, he contends that he was deprived of his due process right to a fair trial by an impartial jury:

> The theory of our system is that the conclusions to be reached in a case will be induced only by evidence and argument in open court, and not by any outside influence, whether of private talk or public print.

*Patterson v. State of Colorado ex rel. Attorney General,* 205 U.S. 454, 462, 27 S.Ct. 556, 558, 51 L.Ed. 879 (1907). Appellant does not point to any specific taint, but argues under *Turner v. State of Louisiana,* 379 U.S. 466, 85 S.Ct. 546, 13 L.Ed.2d 424 (1965); and *Commonwealth v. Stewart,* 449 Pa. 50, 295 A.2d 303 (1972); that the situation was so

inherently prejudicial that prejudice must be presumed. We disagree.

In most cases involving claims of due process deprivations, a showing of identifiable prejudice to the accused is required. *Estes v. State of Texas,* 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965). Nevertheless, there are times when "a procedure employed by the State involves such a probability that prejudice will result that it is deemed inherently lacking in due process." *Id.* at 542–43, 85 S.Ct. at 1633. Thus, in *Turner v. State of Louisiana, supra,* prejudice was presumed where two key witnesses for the prosecution were deputy sheriffs who doubled as jury shepherds during the trial. In *Commonwealth v. Stewart, supra,* prejudice was presumed where the father of a murder victim was on the same panel as the jurors who had been selected for the murder trial, and the father had been in the same room with the jurors who were hearing the case for as long as two and one-half days. In neither *Turner v. State of Louisiana* nor *Commonwealth v. Stewart,* was there any proof that any juror had been spoken to; however, prejudice was presumed to prevent the probability of unfairness.

■■■ We do not believe that a six week lapse of time between jury selection and the day of trial gives rise to a probability of unfairness requiring presumption of prejudice. This court has recently addressed this issue and held that actual prejudice must be demonstrated:

Appellant next assigns as error the failure of the court to swear the jury immediately after it was chosen. It appears that the jury members were impaneled on August 7, 1978, but were not actually sworn until August 18, 1978, the day of trial. Appellant directs us to no authority, and our research has disclosed none, requiring the jury to be sworn immediately after it is chosen. 'In the absence of statute, the time for swearing jurors in chief after they have been examined and opportunity given for challenge is within the discretion of the court.' 50 C.J.S. Juries § 294b. Before swearing the jury on

August 18, the court inquired whether any had become aware of facts or engaged in any discussion which would disallow them from sitting fairly and impartially. None responded, and appellant's counsel made no attempt to inquire of any other possible prejudice stemming from the delay. R.R. 24a In the absence of any actual prejudice, we do not believe the procedure followed to be improper. *Compare, Commonwealth v. Bruno,* 466 Pa. 245, 352 A.2d 40 (1976); *Commonwealth v. Bobko,* 453 Pa. 475, 309 A.2d 576 (1973). (Footnote omitted).

*Commonwealth v. Darush,* 279 Pa.Super. 140, 152, 420 A.2d 1071, 1077 (1980); *judgment of sentence vacated and remanded for resentencing,* 501 Pa. 15, 459 A.2d 727 (1983) (Superior Court's disposition of issue regarding delay in swearing of jury was approved, *see* 501 Pa. at 20 n. 4, 450 A.2d at 730 n. 4). Since appellant has failed to show actual prejudice, this claim of error is devoid of merit.

### 3. Alleged Defective Informations

Appellant's third assertion of error is that the trial court erred in denying his motion to quash the informations. Appellant alleges that the informations were infirm in that they were: (a) overly vague and unspecific as to the dates on which the alleged offenses took place, (b) incorrect in citing to a section of the crimes code which had been repealed, and (c) improperly signed by an assistant district attorney in violation of Pa.R.Crim.P. 225(b). We find no error in the trial court's denial of the motion to quash.

The standard of review in an appeal from a grant or denial of a motion to quash has been set forth by this court:

The decision to grant or deny a motion to quash is within the sound discretion of the trial judge and will be reversed on appeal only where there has been a clear abuse of discretion. *See Commonwealth v. Hackney,* 117 Pa.Super. 519, 522, 178 A. 417, 418 (1935); *Commonwealth v. Schwartz,* 56 Pa.D. & C.2d 147 (C.P.Phila.1972). A court, moreover, "should not sustain a motion to quash ... except in a clear case where it is convinced that harm

has been done to the defendant by improper conduct that interfered with his substantial rights." *Commonwealth v. O'Brien*, 181 Pa.Super. 382, 397, 124 A.2d 666, 674 (1956), *appeal dismissed, Commonwealth v. Laughlin*, 389 Pa. 109, 132 A.2d 265 (1957), *citing Commonwealth v. Brownmiller*, 141 Pa.Super. 107, 116, 14 A.2d 907 (1940).

*Commonwealth v. Niemetz*, 282 Pa.Super. 431, 439–40, 422 A.2d 1369, 1373 (1980).

▮ To be valid, an information must contain:

[T]he date when the offense is alleged to have been committed if the precise date is known, and the day of the week if it is an essential element of the offense charged, provided that if the precise date is not known or if the offense is a continuing one, an allegation that it was committed on or about any date within the period fixed by the statute of limitations shall be sufficient.

Pa.R.Crim.P. 225(b)(3). Herein, both informations provided that the alleged offenses occurred between June, 1979, and December, 1979, a span of seven months.

Appellant maintains that the lack of specificity of the informations violated Pa.R.Crim.P. 225(b)(3), and thereby hindered his ability to present a defense, particularly an alibi. Relying on *Commonwealth v. Devlin*, 460 Pa. 508, 333 A.2d 888 (1975) and *Commonwealth v. Levy*, 146 Pa.Super. 564, 23 A.2d 97 (1941), appellant points out that while the rule does not require absolute specificity, the date of the commission of an offense must be fixed with *reasonable certainty*.

This court has disposed of this identical issue in *Commonwealth v. Niemetz, supra,* wherein the appellant was convicted of rape, involuntary deviate sexual intercourse, indecent assault, and corruption of a minor:

The information in the instant case averred the commission of offenses "on (or about) divers [sic] dates beginning in 1972 and continuing until August, 1977." This course was adopted because the Commonwealth was un-

able to "state the dates on which the offenses occurred with any more specificity." Since time is not of the essence in the crimes for which appellant was charged and convicted, *see Commonwealth v. Yon,* 235 Pa.Super. 232, 341 A.2d 169 (1975); *Commonwealth v. Rouse,* 207 Pa.Super. 418, 218 A.2d 100 (1966), the pertinent allegation contained in the information appears to fit precisely Rule 225's proviso that an allegation that an offense was committed "on or about *any* date within the period fixed by the statute of limitations shall be sufficient" when (1) time is not of the essence and (2) a precise date is unknown. . . . Moreover, we do not believe that it would serve the ends of justice to permit a person to rape and otherwise sexually abuse his child with impunity simply because the child failed to record in a daily diary the unfortunate details of her childhood. Since the facts of the instant case preclude a definitive enumeration of events and because the record belies any assertion that the Commonwealth sought to abuse the flexibility of Rule 225, we hold that it was not an abuse of discretion to deny the motions. (Footnote omitted). (Emphasis in original).

*Id.* 282 Pa.Super. at 439–40, 422 A.2d at 1373. The *Niemetz* court was confronted with the precedent of *Devlin* and *Levy* and held that those cases were distinguishable in that neither case involved a continuing offense, and thus were more susceptible to being fixed with reasonable certainty. We agree with the reasoning of *Niemetz.* Since the instant cases dealt with continuing crimes against each victim, the period of time recited by the informations was sufficient.

Appellant also contends that the informations should have been quashed where he was charged with corruption of minors under 18 Pa.C.S.A. § 3125. That section had been repealed at the time the offenses were allegedly committed,[10] and the offense of corruption of minors had been reenacted substantially verbatim at 18 Pa.C.S.

10. Repealed 1978, July 1, P.L. 573, No. 104, § 1, effective in 60 days.

§ 6301.[11] Immediately prior to trial, the trial judge granted the Commonwealth's motion to amend the information to reflect the proper statutory section. Appellant argues that the grant of this amendment prejudiced and inconvenienced him in the preparation of his defense, and so denied him due process.

Our rules of criminal procedure provide for the amendment of informations "when there is a defect in form, [or in] the description of the offense ... provided the information as amended does not charge an additional or different offense." Pa.R.Crim.P. 229. The purpose of this rule is to insure that a defendant is fully apprised of the charges against him, and to avoid prejudice by prohibiting last minute additions of alleged criminal acts of which a defendant is uninformed. *Commonwealth v. Lawton*, 272 Pa.Super. 40, 414 A.2d 658 (1979); *Commonwealth v. Stanley*, 265 Pa.Super. 194, 401 A.2d 1166 (1979), *aff'd.*, 498 Pa. 326, 446 A.2d 583 (1982). The test is whether the amended provision alleges a different set of events, or its elements or defenses are materially different from the elements or defenses to the crime originally charged. *Commonwealth v. Stanley, supra.*

We fail to see any prejudice at all to appellant in the allowance of this amendment. The events described, the elements, and the available defenses were identical in the original and amended informations. That the informations

**11.** The repealed section, 18 Pa.C.S. § 3125, set forth the elements of the crime as follows:

> Whoever, being of the age of 18 years and upwards, by any act corrupts or tends to corrupt the morals of any child under the age of 18 years, or who aids, abets, entices or encourages any such child in the commission of any crime, or who knowingly assists or encourages such child in violating his or her parole or any order of court, is guilty of a misdemeanor of the first degree.

The current section, 18 Pa.C.S. § 6301, defines the offense as:

> Whoever, being of the age of 18 years and upwards, by any act corrupts or tends to corrupt the morals of any minor less than 18 years of age, or who aids, abets, entices or encourages any such minor in the commission of any crime, or who knowingly assists or encourages such minor in violating his or her parole or any order of court, is guilty of a misdemeanor of the first degree.

referred "to a specific section number of the Crimes Code is unfortunate but not fatal. The offense charged and on what statute it is founded is to be determined from the allegations in the information." *Commonwealth v. Lohr*, 503 Pa. 130, 136, 468 A.2d 1375, 1378 (1983). Appellant's argument is unavailing.

Lastly, appellant charges that the trial court abused its discretion in denying his motion to quash on the basis that the informations were void for failure to have been properly signed by the district attorney or his officially designated authority. Pa.R.Crim.P. 225(b), 42 Pa.C.S. § 8931(i). The informations bore the signature of assistant district attorney Charles P. Mackin, Jr. At the time Mackin signed the informations, his authority to act for the district attorney in signing informations had not been evidenced by a written designation filed with the clerk of courts, in accordance with 42 Pa.C.S. § 8931(i). Thereafter, on May 28, 1980, the appropriate designation was filed. That designation included the district attorney's ratification and confirmation of all acts previously done by Mackin in his capacity as an assistant district attorney. Retrial was held subsequently, on October 22 and 23, 1980.

The requirement of an authorized signature on a criminal information is designed to assure the authenticity of the information and to guarantee that a full inquiry has been made into the facts and circumstances of the case, and that an authorized official has made a reasoned evaluation of the propriety of initiating criminal proceedings. *Commonwealth v. Emanuel*, 501 Pa. 581, 462 A.2d 653 (1983). Herein, undisputed testimony was presented at the omnibus pretrial motion hearing, that on January 25, 1980, the district attorney had personally discussed and approved the filing of the original criminal complaints. N.T. May 9, 1980, at 8–13. These criminal complaints were filed the following day, January 26, 1980. Since a reasoned evaluation by the district attorney had been made initiating the criminal proceedings, we fail to see the point in quashing the informa-

tions and discharging the appellant for a violation of the technical rule imposed to achieve the selfsame goal.

In any event, the required designation of authority was filed well in advance of commencement of trial, and under this court's recent decision in *Commonwealth v. Williams,* 323 Pa.Super. 512, 470 A.2d 1376 (1984), this tardy filing would satisfy the requirement of Pa.R.Crim.P. 225(b). The *Williams* court held that, although the requisite designation of authority had not been filed *prior* to the filing of the information, the filing of the designation of authority in advance of the commencement of trial was sufficient. In keeping with *Williams,* the trial court did not err in denying appellant's motion to quash on the basis that it had been improperly signed.

### 4. Consolidation

■■■ Appellant's fourth assignment of error concerns the consolidation of cases Nos. 28 and 30. Upon the Commonwealth's motion, these two cases were consolidated for trial. Appellant opposed the consolidation and argues here that because of the prejudicial impact of consolidation, the lower court abused its discretion in granting the Commonwealth's request.[12]

■■■ Where informations arise from distinct criminal episodes or transactions, consolidation is a matter within the sound discretion of the trial judge, whose decision will

---

**12.** In response to the Commonwealth's motion for consolidation, appellant requested alternatively that the four cases, Nos. 28, 29, 30, and 31, be combined in one trial. This alternative request emerges as a double jeopardy issue, but appellant has raised it only in the appeal of Nos. 29 and 31, i.e., since the four cases should have been consolidated, the mistrial of Nos. 28 and 30 on May 16, 1980, barred the subsequent trial of Nos. 29 and 31 on July 10 and 11, 1980. *See* discussion *infra,* at II. Appeal of Nos. 29 and 31. Appellant has failed to preserve the obverse double jeopardy issue in *this* appeal, i.e., that the trial of Nos. 29 and 31 on May 16, 1980, barred the subsequent retrial of Nos. 28 and 30 on October 22 and 23, 1980. Thus, this issue is not before us. Moreover, upon remand for retrial of Nos. 28 and 30, appellant may not then raise the issue that such retrial is barred by the prior trial of Nos. 29 and 31. Appellant's voluntary act of seeking and receiving a new trial constitutes a waiver of *any* double jeopardy claim, *Commonwealth v. Sanford,* 497 Pa. 442, 441 A.2d 1220 (1982); *Commonwealth v. Thomas,* 448 Pa. 42, 292 A.2d 352 (1972).

be reversed only upon a manifest abuse of discretion or prejudice to the defendant. *Commonwealth v. Morris,* 493 Pa. 164, 425 A.2d 715 (1981); *Commonwealth v. Moore,* 463 Pa. 317, 344 A.2d 850 (1975). In such instances, consolidation is proper if the evidence is capable of separation by the jury so that there is no danger of confusion, and the evidence of each offense would be admissible in a separate trial for the other.[13] *Id.; Commonwealth v. Laurenson,* 323 Pa.Super. 46, 470 A.2d 122 (1983); *Commonwealth v. King,* 290 Pa.Super. 563, 434 A.2d 1294 (1981); *Commonwealth v. Vickers,* 260 Pa.Super. 469, 394 A.2d 1022 (1978).

Where, however, the informations arise from the same criminal episode or transaction, there is no room for the exercise of discretion and consolidation is compulsory.[14] *Commonwealth v. Tarver,* 467 Pa. 401, 357 A.2d 539 (1976). In this situation, if all known offenses arising from a single criminal episode are *not* tried together, subsequent prosecutions may be barred. *Commonwealth v. Campana,* [*Campana I*], 452 Pa. 233, 304 A.2d 432 (1973), *vacated and remanded,* 414 U.S. 808, 94 S.Ct. 73, 38 L.Ed.2d 44 (1973), *on remand,* 455 Pa. 622, 314 A.2d 854 (1974), *cert. denied* 417 U.S. 969, 94 S.Ct. 3172, 41 L.Ed.2d 1139 (1974).

The lower court here took the approach that the consolidation of the informations was discretionary. The lower court then examined the informations in Nos. 28 and 30, and concluded that consolidation was proper since the informations were nearly identical; i.e., each information charged in the same language that between June, 1979, and December, 1979, the appellant committed indecent assault (five or six times) by placing his penis between the victim's legs and sucking the victim's breasts; indecent exposure by intentionally and knowingly exposing his genitals for the purpose of sexually arousing himself; and corruption of the morals of a minor by displaying obscene literature, pictures,

13. This standard is now codified in Pa.R.Crim.P. 1127 A(1)(a), effective July 1, 1982.

14. This standard is now codified in Pa.R.Crim.P. 1127 A(1)(b), effective July 1, 1982.

and magazines of men and women engaged in sexual intercourse and oral sex. The informations differed in that the corruption of minor charge of No. 28 also alleged that the victim's morals were corrupted or tended to be corrupted by appellant's acts of having indecent contact with a child and indecent exposure before said child.

Appellant contends that this superficial "identity of charges" analysis failed to afford any basis which would support consolidation. We agree. Discretionary consolidation requires a substantive examination of the *evidence* of the crimes to determine whether that evidence is easily separable, and whether the *evidence* of one offense would be admissible at a separate trial of the other. The controlling concern, therefore, is not the general nature of the charges against a defendant, but, rather the evidence of the crimes themselves.[15]

At this point, it must be recognized that the informations are unique in that each charge is comprised of more than one "actual" crime. The informations were not drawn up to distinguish among various counts of each of the three charges listed. Instead, the charges were composed in broad language which would encompass the several specific acts. Thus, for example, the informations each charged indecent exposure only once. However, the evidence indicates that appellant exposed himself to the victims on several occasions, each occasion itself constituting an "actual" crime.

It is abundantly clear, therefore, that we are not confronted with the usual discretionary consolidation situation wherein a single criminal act is sought to be consolidated with another unitary criminal act. These usual cases, such as two distinct robberies, are straightforward—one looks at the evidence of one robbery and compares it to the evidence of the other robbery. How then, are we to analyze consoli-

15. While in some instances the informations may detail the evidence of the crimes to such lengths that a decision on discretionary consolidation can be made from the face of the informations, that is not the case here.

dation of the informations in Nos. 28 and 30, each of which contains three charges relating to a jumble of "actual" criminal events? Since consolidation is governed by the evidence of crimes, we start with a survey of that evidence.

Appellant owned the Circle "S" Ranch which he operated as a campground and horseback riding facility. Joy Michelle Paucke, the victim in case No. 30, lived with her grandmother in a trailer close to the horse barn of the Circle "S" Ranch. Michelle Renee Marshall, Joy's cousin and the victim in case No. 28, lived about one-half mile from the Circle "S" Ranch.

Joy testified that she had known the appellant all her life, since the appellant and his wife often babysat for her while her grandmother was working. N.T. October 22 and 23, 1980, at 32, 54. Consequently, Joy went to the ranch almost daily to ride horses, visit, and play games with other girls. *Id.* at 33, 55. She was treated like the Shirey's grandchild, and roamed the house and ranch as if it were her home. *Id.* at 55.

Joy testified that between June and December of 1979, a series of unusual events involving the appellant, herself, and often other girls, took place. She testified that the appellant would have "us" take down our pants and pull up our shirts and he would "do stuff." *Id.* at 34. Joy stated that this happened in the "bunk room" of the Shirey residence on three or four occasions, and then appellant "would stick his penis between our legs" and "suck our breasts." *Id.* at 36–37. She also testified that during two or three of these incidents, the appellant had her "stick my mouth on his penis." *Id.* at 38. Joy recounted that appellant had shown them his scar from a vasectomy, and explained he couldn't get you pregnant. *Id.* Joy next described a situation where the appellant took her to the bunk room and turned on the movie projector which was located there. The film portrayed a woman on a ladder with a man below her on the ladder "licking her vagina." *Id.* at 39–40. Joy also testified that once when she and Michelle were in appellant's pickup truck with the appellant, he showed them

a book called "Six Steps of Sexes" which depicted a man "sticking his penis up [a woman's] vagina" and "a lady sucking a guy's penis." *Id.* at 41–43. Joy indicated that the appellant provided her books about sex "lots of times." *Id.* at 43. Finally, Joy stated that the appellant had exposed his penis to her on two occasions when another girl named Pam McMillan was present. *Id.* at 50–51.

Pam McMillan was called to corroborate this latter event related by Joy. Pam testified that she was fourteen years of age, and she had frequently gone camping with her parents at the Circle "S" Ranch. *Id.* at 110. Pam testified that once in the summer of 1979, she saw the appellant unzip his pants and expose himself to her and Joy. *Id.* at 112–13.

Michelle did not share the same familiarity with the Shirey's and the Circle "S" Ranch as did Joy. Michelle had known the appellant for about three years prior to the summer of 1979, and only went up to the ranch when she was with Joy. *Id.* at 91, 92, 107. Michelle testified that Joy was always with her when the incidents with the appellant occurred. *Id.* at 94, 100, 102, 107. Michelle stated that she and Joy had gone into appellant's bus (an old school bus equipped for camping) with appellant on about five occasions. On each of these occasions, the appellant stuck his penis between their legs, tried to feel them, and showed them dirty books. *Id.* at 94–98. Michelle related another incident where appellant drove her, Joy, Julie, and Bobbi Jo to Perry's Sport Shop, and had felt them between their legs. *Id.* at 99–101. Michelle also remembered a time when she and Joy were up at the turkey feeder with appellant, and he had felt them between their legs. *Id.* at 101–102. Lastly, Michelle testified that at various times appellant showed the girls books with pictures of naked men and women. At these various times she was with Joy, or with Joy and Bobbi Jo, or with Joy, Bobbi Jo, and Julie. *Id.* at 102–103.

Having surveyed the evidence of the crimes, we are able to break that evidence down into three groups for the purposes of a consolidation analysis. The first group in-

cludes what we shall call "simultaneous crimes." All of the episodes narrated by Michelle also included Joy, and the offenses described occurred to both of the girls simultaneously.[16] Joy, however, testified to additional crimes in which Michelle was not involved. Specifically, Joy testified to additional crimes that involved the showing of a film in the bunk room, and the appellant's exposure of his genitals in front of her and Pam McMillan. We treat the evidence of these additional crimes as two separate groups in dealing with the consolidation issue. Thus, our consolidation analysis narrows down to questions of: consolidation of No. 28 with the simultaneously occurring crimes of No. 30, consolidation of No. 28 with the film incident of No. 30, and consolidation of No. 28 with the Joy Paucke and Pam McMillan incident of No. 30.

### A. Consolidation of No. 28 with the simultaneously occurring crimes of No. 30.

■■■ We need not engage in a discretionary consolidation analysis with respect to consolidation of No. 28 with the simultaneously occurring crimes of No. 30. These simultaneous crimes were subject to consolidation which was not merely discretionary, but compulsory. Compulsory consolidation is required of all known offenses arising from a single criminal episode. *Commonwealth v. Tarver, supra; Commonwealth v. Campana, supra.* A single criminal episode exists where a number of charges are logically and/or temporally related and share common issues of law and fact, and separate trials would involve substantial duplication and waste of scarce judicial resources. *Commonwealth v. Hude,* 500 Pa. 482, 458 A.2d 177 (1983).

■■■ We have no difficulty here in finding that the situations which concerned both Michelle and Joy were single criminal episodes.[17] Michelle testified that whenever an

---

**16.** While Joy's testimony confirmed that, with one exception, she was not alone with the appellant during the course of these incidents, she was not uniformly questioned as to who else had been involved.

**17.** We note that appellant did not object to the *joinder* of crimes *within* each information.

offense happened, she was always with Joy, and they both suffered the same violations. Joy described these incidents as being perpetrated on "us." Each girl witnessed appellant's conduct towards the other during these incidents. Clearly, the crimes upon each girl during these incidents took place in a short span of time. Crimes which are closely related in time require little analysis to determine that a single criminal episode exists. *Id.* Furthermore, the crimes are logically related in that the factual and legal issues presented were identical. Prosecution in two separate trials would have been complete duplication. *Id.* Finally, the case of *Commonwealth v. Green*, 232 Pa.Super. 134, 335 A.2d 493 (1975), illustrates the principle that situations involving multiple victims were intended to be included in the concept of a single criminal episode.[18] Thus, the simultaneous crimes against Michelle and Joy constituted single criminal episodes requiring compulsory consolidation of No. 28 with those simultaneous crimes in No. 30.

### B. Consolidation of No. 28 with the film incident of No. 30.

Joy testified that in the bunk room of the Shirey residence, the appellant showed her a film which contained sexual material. Her testimony, by use of a singular pro-

---

**18.** This court in *Green* found that a fray which involved the accused and four others, and resulted in three separate sets of charges, qualified as a single criminal incident:

> An argument between the appellee and another man soon entangled the appellee and his two male victims in a physical struggle which the female victim attempted to terminate by seizing the knife-brandishing appellee. The fact that the struggle moved the participants from the porch to the driveway, that there were several victims, or that the first victim was already wounded when the second, then third, victims became involved does not change the nature of the encounter to a segregated series of incidents. It remains a single distinctive occurrence, a comprehensive series of acts so as to qualify as a single criminal episode.... In addition, the Model Penal Code, upon which Section 110 of the Crimes Code is based, indicates in its commentary to the sections dealing with compulsory joinder of charges that situations involving multiple victims were contemplated as being included in the concept of a single criminal episode when the sections were drafted. (footnotes omitted).

*Id.* 232 Pa.Super. at 140–41, 335 A.2d at 496.

noun, indicated that she had been alone with the appellant at the time. Her preliminary hearing testimony confirmed that no one was with her during this incident besides the appellant. N.T. February 8, 1980, at 30. Thus, the issue here is whether the trial judge abused his discretion in allowing this aspect of the information at No. 30 to be consolidated with No. 28.

The discretionary consolidation analysis first requires that the evidence of the two things sought to be consolidated be easily separable. On the one hand, we have Michelle's testimony as to what crimes were committed upon her; on the other hand, we have Joy's testimony as to the film incident. This evidence was brief and not complex. *Commonwealth v. King, supra.* In addition, the unique content of the film incident afforded the jury a ready means of demarcation. Thus, the jury could have easily distinguished between the crimes perpetrated on Michelle and the film incident.

A more difficult criteria is whether the evidence of the film incident would be admissible in a separate trial of the offenses in which Michelle was a victim. Our courts have often repeated the two-step test for determination of such admissibility:

"One of our most fundamental and prized principles in the administration of criminal law is that a distinct crime, except under certain special circumstances, cannot be given in evidence against a defendant who is being tried for another crime. This is because the fact that a person has committed one offense is not proof that he has committed another and because the effect of such testimony upon a jury is nevertheless bound to create prejudice and an emotional reaction on their part against the defendant." *Commonwealth v. Burdell,* 380 Pa. 43, 47, 110 A.2d 193, 195 (1955). See also *Commonwealth v. Peterson,* 453 Pa. 187, 307 A.2d 264 (1973); *Commonwealth v. Boulden,* 179 Pa.Super. 328, 116 A.2d 867 (1955); See, generally, McCormick on Evidence, § 190 at 447–454 (2nd Ed.1972). Special circumstances justifying

exceptions to the general rule exist when the evidence of other crimes "tends to prove (1) motive; (2) intent; (3) absence of mistake or accident; (4) a common scheme, plan or design embracing commission of two or more crimes so related to each other that proof of one tends to prove the others; or (5) to establish the identity of the person charged with the commission of the crime on trial—in other words, where there is such a logical connection between the crimes that proof of one will naturally tend to show that the accused is the person who committed the other." *Commonwealth v. Peterson,* supra, 453 Pa. at 197–198, 307 A.2d 269. See also *Commonwealth v. Wable,* 382 Pa. 80, 114 A.2d 334 (1955); *Commonwealth v. Boulden,* supra. See *Commonwealth v. Hude,* 256 Pa.Super. 439, 390 A.2d 183 (1978). Second, even if a particular exception applies, the trial court must balance the need for the evidence against its potential prejudice in order to determine its admissibility. See also *Commonwealth v. Ulatoski,* 472 Pa. 53, 63 n. 11, 371 A.2d 186, 191 n. 11 (1977).

*Commonwealth v. Wright,* 259 Pa.Super. 293, 298–99, 393 A.2d 833, 835–36 (1978).

At the outset, we observe that this list of five well-recognized exceptions [19] is sometimes supplemented by what has been termed the "res gestae" exception. *Commonwealth v. Stufflet,* 276 Pa.Super. 120, 419 A.2d 124 (1980); *Commonwealth v. Stevens,* 237 Pa.Super. 457, 352 A.2d 509 (1975); *see also,* MCCORMICK, EVIDENCE § 190 (2d Ed. 1972); J. WIGMORE, EVIDENCE § 218 (Tillers rev. 1983).

**19.** According to Professor Wigmore, J. WIGMORE, EVIDENCE §§ 215, 216 (Tillers rev. 1983); these "exceptions" are not really exceptions at all, but actually manifestations of the well-established principle of multiple admissibility.

While "other criminal conduct" evidence is inadmissible if offered to show bad character or propensity, this inadmissibility does not prevent its admissibility for any other purpose which is otherwise proper. If independent relevance exists, the criminality of the "other conduct" is immaterial; however, it is always open to have the jury instructed in the limited purposes and use of the evidence.

Since this exception comes into play in the appeal of No. 44, we treat it as a sixth exception here as well.

The first exception for the admissibility of "other crimes" evidence is motive. For "other crimes" evidence to be relevant to motive, that evidence must give sufficient ground to believe that the crime currently being considered grew out of or was in any way caused by the prior set of facts and circumstances. *Commonwealth v. Roman*, 465 Pa. 515, 351 A.2d 214 (1976); *Commonwealth v. Kasko*, 322 Pa.Super. 62, 469 A.2d 181 (1983). Here we find no indication or suggestion that the occurrence of the film incident provided appellant a motive to commit the crimes against Michelle (or vice versa), or that the film incident and crimes against Michelle were motivated by peculiar circumstances common to both.

The second and third exceptions allow evidence of prior crimes which is independently relevant to show intent, or absence of mistake or accident. Here, however, the appellant did not claim that his conduct was either innocent or accidental. Instead, he argued that the crimes alleged were fabrications, concocted by the girls because of resentment. Since appellant's mental state was not at issue in the crimes against Michelle, evidence of the film incident with Joy would not have been admissible to prove his mental state. *Commonwealth v. Kasko, supra; Commonwealth v. Bradley*, 243 Pa.Super. 208, 364 A.2d 944 (1976).

The fourth exception requires that the "other crimes" evidence demonstrate a common scheme, plan, or design. To fit within this exception there must be such a high correlation in the details of the crimes that proof that the accused committed one makes it very unlikely that anyone but the accused committed the other. *Commonwealth v. Bastone*, 262 Pa.Super. 590, 396 A.2d 1327 (1979). As otherwise stated, both crimes must embrace distinctive elements and be so nearly identical as to bear the "signature" or be the "handiwork" of the same person. *Commonwealth v. Morris, supra.*

The allegations in the film incident and display of "dirty" literature to Michelle have certain similarities. They both involve young girls of a similar age group, each girl having an acquaintance with the appellant. In both cases, appellant was accused of roughly the same type of misconduct, and the scene of the misconduct was the Shirey ranch. On the other hand, one crime involved the use of a movie projector and film while the other involved a book. One crime took place inside the Shirey residence and the other did not. One crime involved only one girl and the other involved more than one. Finally, the display of obscene materials to young children is, sadly, not so rare that such a display is by itself an earmark of a common scheme, plan, or design. *Commonwealth v. Shively*, 492 Pa. 411, 424 A.2d 1257 (1981); *Commonwealth v. Kasko, supra.* From these facts, we do not find any high correlation of details which would permit evidence of the film incident to be admissible under the common scheme exception.

Under the fifth exception, evidence of "other crimes" is independently relevant and admissible if it tends to establish the identity of the perpetrator. Like the second and third exceptions above, the "identity" exception is inapplicable because identity was not at issue. *Commonwealth v. Kasko, supra; Commonwealth v. Bradley, supra.*

Finally, we come to the "res gestae" exception.[20] This class includes "other crimes" which are an inseparable part of the whole deed. J. WIGMORE, *supra*, § 218. McCormick characterizes this exception as the "same transaction" exception, wherein evidence of "other crimes" is permissible "to complete the story of the crime on trial by proving its immediate context of happenings near in time

---

**20.** Professor Wigmore, J. WIGMORE, *supra,* § 218, suggests that the term "res gestae" be abandoned:

> The term "res gestae" should be once and for all abandoned as useless and confusing. Let it be said that such acts are receivable as "necessary parts of the proof of an entire deed," or as "inseparable elements of the deed," or as "concomitant parts of the criminal act," or anything else that carries its own reasoning and definition with it; but let legal discussion sedulously avoid this much-abused and wholly unmanageable Latin phrase.

and place." MCCORMICK, *supra* at 448. Our supreme court has spelled out the "same transaction" or "res gestae" exception, saying that:

> [S]uch evidence is admissible where "such prior conviction or criminal act formed a part of a chain, or was one of a sequence of acts, or became part of the history of the event on trial, or was part of the natural development of the facts."

*Commonwealth v. Brown,* 462 Pa. 578, 591, 342 A.2d 84, 90 (1975) (Quoting from *Commonwealth v. Williams,* 307 Pa. 134, 148, 160 A. 602, 607 (1932)).

The film incident with Joy was neither an integral part of the immediate context of events surrounding the crimes against Michelle, nor so intertwined in any other way such that it was part of the natural development of the facts of any of the crimes against Michelle. Thus, the "same transaction" or "res gestae" exception affords no basis for admissibility of the film incident.

There being no independent relevance to allow evidence of the film incident in a separate trial of the crimes against Michelle, we need not engage in the second prong of the test of the admissibility of "other crimes" evidence. It is only after a determination that "other crimes" evidence is independently relevant, that the court must undergo the next step of deciding whether the probity of that evidence is outweighed by the prejudice it engenders.

■ Accordingly, the consequence of the trial court's consolidation of Nos. 28 and 30 was to permit improper evidence of the film incident to influence the jury's consideration of the crimes against Michelle. Thus, discretionary consolidation of Nos. 28 and 30 was erroneous to the extent that this crime of No. 30 was consolidated with No. 28. Upon retrial, the evidence of this additional crime must be excluded, and the Commonwealth may try the appellant separately on this offense.

## C. Consolidation of No. 28 with the Joy Paucke and Pam McMillan incident of No. 30.

At trial, Joy testified to an incident which involved her, Pam McMillan, and the appellant. Appellant's counsel objected to this inquiry, and a sidebar conference was held in which the assistant district attorney related that Joy would testify that she saw the appellant and Pam McMillan having sexual intercourse, that Joy actively participated in this activity by fondling appellant's penis upon his request, and that appellant's penis was thereby exposed to her. N.T. October 22 and 23, 1980, at 43–45. This incident as it relates to Pam McMillan was, in fact, the basis for the statutory rape charge brought against appellant in case No. 44. The trial court found that the testimony as to actual sexual intercourse would be too prejudicial to the appellant, and so restricted all testimony regarding this incident to prevent any indication that sexual intercourse had occurred. Joy's subsequent testimony was limited, therefore, and she stated only that on two occasions, the appellant had exposed himself before her and Pam McMillan. *Id.* at 49–52. The jury could infer from this testimony that appellant had indecently exposed himself to Pam as well as Joy.

The Commonwealth called Pam McMillan to corroborate this aspect of Joy's testimony. Likewise, Pam's testimony was confined to her observation that on one occasion appellant had exposed himself to her and Joy. *Id.* at 110–113. The Commonwealth also established that Pam was fourteen years of age at the time of trial, thereby allowing the jurors to surmise that the appellant had committed the crimes of corrupting the morals of a minor less than eighteen years of age, with regard to Pam.

The consolidation issue presented here is whether the additional crime of No. 30 that the appellant exposed himself to Joy and Pam should have been consolidated with the crimes against Michelle in No. 28.

We again have no difficulty with the initial question of easy separability. The testimony of Joy and Pam incident and the crimes against Michelle was simple and brief.

Since Pam was called solely to testify about the one incident, her testimony provided an obvious means for the jury to distinguish between that incident and the crimes against Michelle.

We run aground, however, on the next segment of the discretionary consolidation analysis, that evidence of one crime would be admissible in a trial of the other.

Looking at the six exceptions, it is apparent that the four exceptions based on motive, intent, absence of mistake, and identity, are inapplicable. There is no indication of motive, and there were no underlying issues of intent, absence of mistake, or identity in the crimes against Michelle. The "res gestae" or "same transaction" exception is also easily disposed of because evidence of the Joy and Pam incident was not necessary to the natural development of the facts of any of the crimes against Michelle.

The only remaining exception is the common scheme exception. Again, there are some parallels between the Joy and Pam incident and the crimes against Michelle—young girls were involved, each girl had an acquaintance with appellant, the scene was generally the Shirey ranch, and the appellant tried to sexually abuse the girls. However, these broad similarities do not rise to the level of a modus operandi required under the common scheme exception. Furthermore, there exists the significant dissimilarity here that the Joy and Pam incident involved the act of sexual intercourse and the fondling of appellant's penis, while appellant's activity towards Michelle involved trying to feel her and placing his penis between her legs.[21] We cannot say that the Joy and Pam incident was so obviously the "handiwork" of the appellant that it would be admissible in a trial for the crimes against Michelle.

21. The jury was never informed that the Joy and Pam incident involved anything more than indecent exposure. However, in applying the common scheme test, we are not circumscribed by the limited amount of knowledge imparted to the jury. We look at the actual crimes themselves to determine their commonality.

■ Accordingly, the consequence of the trial court's consolidation of Nos. 28 and 30 was to permit improper evidence of the Joy and Pam incident to influence the jury's consideration of the crimes against Michelle. Thus, discretionary consolidation of Nos. 28 and 30 was erroneous to the extent that the Joy and Pam crime of No. 30 was consolidated with No. 28. Upon retrial, the evidence of this additional crime must be excluded, although the Commonwealth may attempt to try the appellant separately for this offense.[22]

## 5. "Obscenity"

■ Appellant's fifth assignment of error deals with the use of the term "obscenity." The corruption of morals charges in both Nos. 28 and 30 were supported by the allegation that appellant showed the child "obscene" literature, pictures, and movies. At trial, both girls testified as to the content of the materials exhibited to them. Michelle remarked that appellant showed them "dirty books" which contained pictures of "naked women and naked men." N.T. October 22 and 23, 1980, at 95, 103. Joy was more descriptive, recounting that appellant showed her a film about "sex" in which "there was a lady standing on the ladder, and a guy on a ladder licking her vagina." *Id.* at 40. Joy also testified that appellant showed them a book entitled "Six Steps of Sexes" which portrayed a "guy sticking his penis up [a woman's] vagina," as well as "a lady sucking a guy's penis." *Id.* at 41–42.

At the close of the Commonwealth's case in chief, the appellant demurred to the corruption of minors charges on the basis that, since the Commonwealth chose to charge the appellant with the display of "obscene" material, they must prove that the material was constitutionally "obscene" which required a showing of community standards under

22. Since the Joy and Pam incident was the subject of the trial at No. 44, any attempt by the Commonwealth to prosecute the appellant now for this offense against Joy may be barred by double jeopardy considerations.

*Commonwealth v. LaLonde,* 447 Pa. 364, 288 A.2d 782 (1972).

We need not decide whether, by charging the display of "obscene" literature as the substance of corruption of a minor, the Commonwealth was bound to prove that the materials were "obscene" in the constitutional sense.[23] Appellant's motion was specific—that the *LaLonde* burden of proof had not been met. *LaLonde* held that in obscenity cases, the Commonwealth had the burden of establishing community standards as to the challenged material's prurient appeal and utter lack of redeeming social value as well as its patent offensiveness. *LaLonde,* however, was overruled in 1974 by *Commonwealth v. Rodgers,* 459 Pa. 129, 327 A.2d 118 (1974); *see also Long v. 130 Market St. Gift and Novelty, etc.,* 294 Pa.Super. 383, 440 A.2d 517 (1982). Thus, there is no merit to appellant's contention that the Commonwealth failed to prove the constitutional standards of "obscenity" under *LaLonde.*

 Appellant now presses a broader argument—that all references to the term "obscenity" were improper, that the Commonwealth gave the jury nothing of an evidentiary nature which could constitutionally be classified as "obscenity," and that the trial judge gave the jury no legal definition of what could constitutionally be classified as "obscenity." Having examined the record, we find no objections raised by appellant in reference to "obscenity" except as to the *LaLonde* burden discussed above. Appellant's further "obscenity" arguments are waived, and we need not discuss their merit.

**23.** We note that our crimes code specially provides for the precise offense of the display of sexual materials to minors, 18 Pa.C.S. § 5903(c). That section is violated by the dissemination of either "obscene materials" or "explicit sexual materials" to minors, each of which is fully and carefully defined. Since statutes in *pari materia* should be construed together, 1 Pa.C.S. § 1932, and special statutory provisions prevail over general statutory provisions, *Commonwealth v. Soltis,* 311 Pa.Super. 195, 457 A.2d 562 (1983); 1 Pa.C.S. § 1933, we would advise that these definitions be charged if requested on retrial.

Accordingly, we reverse on the appeal of Nos. 28 and 30 (No. 1476 PHL81), and remand for a new trial consistent with this opinion. Jurisdiction is not retained.

## II. APPEAL FROM NOS. 29 and 31

Appellant raises five issues as well as several sub-issues in this appeal. Those general issues concern: (1) alleged defective nature of the informations, (2) alleged double jeopardy violation, (3) sufficiency of the evidence, (4) the trial court's denial of appellant's motion for a mistrial, and (5) the trial court's failure to give a missing witness charge. Because of our disposition of the second issue, we need only address issues (1) and (2).

### 1. Alleged Defective Informations

Appellant's first assertion of error is that the trial court erred in denying his motion to quash the informations because they were: (a) overly vague and unspecific as to the dates on which the alleged offenses took place, (b) incorrect in citing to a section of the crimes code which had been repealed, and (c) improperly signed by an assistant district attorney in violation of Pa.R.Crim.P. 225(b).

We dealt with these identical issues in appellant's appeal from Nos. 28 and 30, and our determination in that appeal is conclusive here.[24]

24. In the appeal from Nos. 28 and 30, we dismissed appellant's claim that the informations were overly vague on the basis that the offenses were *continuing* offenses. *Commonwealth v. Niemetz, supra.* Likewise, the informations at Nos. 29 and 31 alleged continuing offenses against each girl over the three-month span from October, 1979, through December, 1979. From the evidence established at the trial of Nos. 29 and 31, however, the offenses could not fairly be characterized as "continuing" offenses against each victim: the victim at No. 29 testified to unusual events occurring on two truck rides with appellant one day in October, and an incident in the bus about one week thereafter; the victim at No. 30 testified only as to the same two truck rides with appellant one day in October. Appellant did not request a delineation of the "continuing" offenses generally alleged in the informations, via a Bill of Particulars, but merely moved to quash for vagueness as to date. The motion to quash having been directed to the language of the informations, the continuing nature of the offenses alleged therein was sufficient to withstand the motion.

132

## 2. Alleged Double Jeopardy Violation

Appellant's second assignment of error concerns the issue of double jeopardy. On January 26, 1980, the appellant was arrested under the four criminal actions at Nos. 28, 29, 30, and 31. On February 8, 1980, one preliminary hearing was held on Nos. 28, 29, 30, and 31. On May 9, 1980, a suppression hearing was held regarding all four cases. Thereafter, the Commonwealth moved to consolidate for trial No. 28 with No. 30, and No. 29 with No. 31. The appellant objected to consolidation, arguing that all four cases should be tried separately, or, in the alternative, all four cases should be combined in one trial. The consolidation motion was granted in conformity with the Commonwealth's request. Thus, trial was scheduled for Nos. 28 and 30 on May 15, 1980; and for Nos. 29 and 31 on July 10, 1980.

The trial at Nos. 28 and 30 transpired as scheduled on May 15 and 16, 1980. The jury was sent out to deliberate and was unable to reach a verdict. The trial judge declared a mistrial on May 16, 1980. Retrial did not occur until October 22, 1980.

Immediately prior to trial of Nos. 29 and 31 on July 10, 1980, the appellant moved to quash the informations. He argued that the offenses at Nos. 29 and 31 arose from the same criminal episodes as the offenses already tried at Nos. 28 and 30, and under the constitutional proscription against double jeopardy, *Commonwealth v. Campana, supra,* further prosecution was barred. The trial court denied the motion, and the trial which ensued resulted in appellant's conviction of corruption of minors in each information.

■■■ The double jeopardy clause of the Fifth Amendment protects a criminal defendant against multiple punishments or successive prosecutions for the same offense. *Abney v. United States,* 431 U.S. 651, 97 S.Ct. 2034, 52 L.Ed.2d 651 (1977); *United States v. Dinitz,* 424 U.S. 600, 96 S.Ct. 1075,

47 L.Ed.2d 267 (1976).[25] In implementing this protection, our supreme court held that the double jeopardy clause requires a prosecutor "to bring, in a single proceeding, all known charges against a defendant arising from a 'single criminal episode.'" *Campana I, supra,* 452 Pa. at 253, 304 A.2d at 441. Our initial determination, therefore, is whether the charges in Nos. 29 and 31 arose from the same criminal episodes as the charges in Nos. 28 and 30. As discussed earlier, this determination depends on whether the charges are logically and/or temporally related, and share common issues of law and fact. *Commonwealth v. Hude, supra.*

■ The charges lodged against appellant at No. 29 were indecent assault and corruption of a minor, said charges pertaining to Bobbi Jo Marshall. The charges lodged against appellant at No. 31 were indecent assault and corruption of a minor, said charges pertaining to Julie Lynn Marshall. Both girls testified at trial, and their testimony unmistakably displayed that the charges at Nos. 29 and 31 arose from the same criminal episodes prosecuted at Nos. 28 and 30.

The Marshall family moved into a home close to the Circle "S" Ranch in October, 1979. Three of the Marshall girls, Michelle, Bobbi Jo, and Julie, frequently associated with Joy Paucke, who was their cousin and lived close by. Soon after the Marshall's moved in, Joy asked the three girls to come over to her house. They did so and all four of the girls went to the appellant's horse barn. N.T. July 10 and 11, 1980, at 24–25, 58–59. There Bobbi Jo and Julie met the appellant for the first time, and he offered to drive the four girls up from the barn to his house. The girls agreed, and all four of them got into appellant's pickup truck—Joy sat up front with the appellant, and the other three sat in the rear portion of the pickup. *Id.* at 25, 59. Appellant drove a

25. The Fifth Amendment double jeopardy clause is binding on the states through the Fourteenth Amendment. *Benton v. Maryland,* 395 U.S. 784, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969); *Commonwealth v. Grazier,* 481 Pa. 622, 393 A.2d 335 (1978).

short distance, stopped, and Michelle switched with Joy. Appellant drove a little further, stopped, and Bobbi Jo switched with Michelle. *Id.* at 25–26, 59–60. Bobbi Jo testified that when she was up front with the appellant, he touched her between the legs, and tried to unbutton her blouse. *Id.* at 26, 33–34, 43–44. The truck was moving slowly, and she jumped out of the cab. Appellant stopped the pickup and Bobbi Jo climbed into the back of the pickup. *Id.* at 26. The appellant wanted Julie to get up front, but she refused. *Id.* at 26, 59–60.

The appellant then drove the four girls to his house where they played with two little girls named Patty and Crissy for about an hour. *Id.* at 26, 60. Afterwards, the appellant drove the four girls back to Joy's house. They all sat in the front seat of the pickup with appellant, with Julie sitting on Joy's lap in the middle. *Id.* at 61. The appellant reached his hand under Julie's blouse and tried to unhook her bra. She told the appellant to stop, and he did. *Id.* at 61, 68.

The four girls stayed at Joy's house for two to three hours, and ate dinner. *Id.* at 61. Later that evening, the appellant stopped by. He told Joy's grandmother that he was on his way to Perry's Sport Shop, and asked if she needed anything, and if the girls wanted to ride up with him. *Id.* at 27, 62. The girls decided to go, and all four of them rode in the cab of the pickup with appellant. Enroute, the appellant tried to show the girls "dirty" books containing pictures of "naked women and naked men." *Id.* at 28, 62.[26] They reached Perry's Sport Shop, and spent a little time there. The appellant then offered to take the girls to the Dandee Freeze, but he wanted Julie to sit beside him. *Id.* at 29, 63. Julie moved over to sit on Joy's lap next to the appellant. *Id.* at 64. On the way back to Joy's house from the Dandee Freeze, the appellant again tried to show them "dirty" books. *Id.* at 28. Julie testified that appel-

---

**26.** It is not clear who actually got the books out. Bobbi Jo could not remember, and Julie stated that the appellant told Joy to get them from behind the seat. *Id.* at 45, 62–63.

lant "put his hand between my legs where it didn't belong." *Id.* at 64. The appellant then asked the four girls if any of them wanted him to "rub them" or "feel them." They responded negatively. *Id.* at 30, 64–65. Appellant dropped the girls off at Joy's house.

Bobbi Jo recounted an additional incident which took place roughly one week later. She, Michelle, and Joy were sitting on the edge of the bed in the appellant's converted school bus. The appellant was there, and he asked them if they wanted to look at "dirty" books, and they replied "no." *Id.* at 30–31. The appellant told them that he had a scar and could not have babies. *Id.* at 31. The appellant tried to put his hand between Bobbi Jo's legs, and she told him to leave her alone, which he did. *Id.* at 32. The girls then left by jumping out the back door of the bus.

From these facts, it is evident that the criminal episodes involving Bobbi Jo and Julie were the same criminal episodes that involved Michelle and Joy. In both trials, each girl testified that the others were present, and as such, they were multiple victims—a situation ideally suited to the concept of "single criminal episode." *Commonwealth v. Green, supra.*

Furthermore, there can be no doubt that the Commonwealth was aware that the offenses against Bobbi Jo and Julie coincided with the criminal incidents concerning Michelle and Joy. From the inception of the Commonwealth's prosecution of these proceedings, these four cases were handled as one—the appellant was arrested on all four on the same day, the preliminary hearing for the four cases was held in one proceeding, and the suppression hearing pertained to all four cases.[27] Cognizant of the factual simultaneity of the crimes, the Commonwealth nevertheless determined that No. 28 should be tried with No. 30, and No. 29 should be tried with No. 31. Trial in this manner

---

**27.** If the Commonwealth's early investigation of the four cases fell short of exhibiting an overlap between them, the Commonwealth was surely apprised that the four girls were together during certain of these incidents by the testimony elicited at the preliminary hearing.

threatened a violation of appellant's constitutional right not to be placed in jeopardy twice for conduct arising from a single criminal episode. *Commonwealth v. Campana, supra.*

While it is evident that the simultaneously occurring crimes of Nos. 28, 29, 30 and 31 should have been tried together, the posture of appellant's double jeopardy objection may have been misplaced. Here, appellant argues that trial of Nos. 29 and 31 on July 10 and 11, 1980, was barred by the prior prosecution of Nos. 28 and 30. The only prior prosecution of Nos. 28 and 30, which existed at that time, was the mistrial of May 16, 1980.

A defendant may be tried twice for the same offense without a violation of double jeopardy if his first trial concluded without a verdict for reasons of "manifest necessity." *Arizona v. Washington,* 434 U.S. 497, 98 S.Ct. 824, 54 L.Ed.2d 717 (1978); *United States v. Perez,* 9 Wheat. 579, 6 L.Ed. 165 (1824); *Commonwealth v. Murry,* 498 Pa. 504, 447 A.2d 612 (1982); *Commonwealth v. White,* 476 Pa. 350, 382 A.2d 1205 (1978). Manifest necessity for the declaration of a mistrial exists where there is no reasonable probability that the jury will agree upon a verdict. *Green v. United States,* 355 U.S. 184, 78 S.Ct. 221, 2 L.Ed.2d 199 (1957); *Wade v. Hunter,* 336 U.S. 684, 69 S.Ct. 834, 93 L.Ed. 974 (1949); *Commonwealth v. Murry, supra; Commonwealth v. White, supra.* This determination rests largely in the discretion of the trial court, and depends upon an array of factors: whether the jury has indicated that it is "hopelessly deadlocked;" whether the exhaustion of the jury might induce the minority to vote for a verdict which they would otherwise not support; the length of trial and the number, complexity, and gravity of the charges; and the time taken in deliberation. *United States v. See,* 505 F.2d 845 (9th Cir.1974), *cert. denied, Gordon v. United States,* 420 U.S. 992, 95 S.Ct. 1428, 43 L.Ed.2d 673 (1975); *see also Commonwealth v. Bartolomucci,* 468 Pa. 338, 362 A.2d 234 (1976); *Commonwealth v. Monte,* 459 Pa. 495, 329 A.2d 836 (1974). Furthermore, if a defendant either re-

quested or consented to the declaration of mistrial following the jury's inability to reach a verdict, he waives any claim that the mistrial was not manifestly necessary. *Commonwealth v. Bartolomucci, supra.*

Our evaluation of appellant's double jeopardy argument requires, therefore, that we examine the trial court's declaration of mistrial in Nos. 28 and 30. If the trial court's declaration of mistrial was not manifestly necessary, or if the appellant neither requested nor consented to that declaration, his subsequent trial in Nos. 29 and 31 would be barred. *See* 18 Pa.C.S. § 110(3).

We are constrained to observe that Johnson, J. in his concurring and dissenting opinion, takes the position that the recent Supreme Court case of *Richardson v. United States,* —— U.S. ——, 104 S.Ct. 3081, 82 L.Ed.2d 242 (1984), renders appellant's double jeopardy argument meritless. *Richardson* involved a double jeopardy claim against retrial following a jury's inability to agree on a verdict as to several of the counts against the appellant. The basis for the double jeopardy argument in *Richardson,* however, was *not* that the mistrial declaration had not been manifestly necessary. In *Richardson,* the petitioner argued instead that since insufficient evidence had been presented at the mistrial, retrial was barred under *Burks v. United States,* 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978) (holding that once a defendant obtained an unreversed appellate ruling that the government had failed to introduce sufficient evidence to convict him at trial, a second trial was barred by the double jeopardy clause). In that posture, *Richardson* held that the decision in *Burks* applied only after there had been some event, such as acquittal, which terminated original jeopardy. Furthermore, the court held that on the authority of *United States v. Perez, supra,* and *Logan v. United States,* 144 U.S. 263, 12 S.Ct. 617, 36 L.Ed. 429 (1892), the failure of the jury to reach a verdict was not an event which terminated jeopardy.

Johnson, J. interprets this final holding broadly to mean that the failure of the jury to reach a verdict is *never* an

event which terminates original jeopardy, and so double jeopardy is *never* a concern upon retrial. This interpretation overlooks the *Richardson* court's express reliance upon *Perez* and *Logan* which in fact established the manifest necessity determination of whether double jeopardy had been violated. Thus, the manifest necessity analysis must be considered as *implicit* in the final holding of *Richardson*, which did not even discuss the issue of whether the declaration of mistrial had been manifestly necessary.

Furthermore, the *Richardson* court made the observation that:

> Where, as here, there has been only a mistrial resulting from a hung jury, *Burks* simply does not require that an appellate court rule on the sufficiency of the evidence because *retrial might be barred by the Double Jeopardy Clause.* See *Justices of Boston Municipal Court v. Lydon,* 466 U.S. —, — [104 S.Ct. 1805, 80 L.Ed.2d 311 (1984)] (1984). (emphasis added)

— U.S. at —, 104 S.Ct. at 3085. This recognition that retrial might be barred by the double jeopardy clause evolves directly from considerations of manifest necessity. *Justices of Boston* cites to *United States v. Scott,* 437 U.S. 82, 98 S.Ct. 2187, 57 L.Ed.2d 65 (1978) for the streamlined proposition that the double jeopardy clause protects against retrial after a declaration of a mistrial in "certain circumstances". *Justices of Boston,* 466 U.S. at — n. 6, 104 S.Ct. at 1813 n. 6. In turn, it is *United States v. Scott* which describes these "certain circumstances" by relying on the manifest necessity test of *Perez:* "The fact that the trial judge contemplates that there will be a new trial [following a declaration of mistrial] is not conclusive on the issue of double jeopardy .... the trial court's discretion must be exercised with a careful regard for the interests first described in *United States v. Perez.*" 437 U.S. at 92–93, 98 S.Ct. at 2194.

It is evident, therefore, that *Richardson* does not overrule the established manifest necessity examination upon a

double jeopardy claim following a declaration of mistrial. We must proceed with such an examination.

Unfortunately, we cannot at this time conduct an examination of the mistrial at Nos. 28 and 30. The transcript of this proceeding is not part of the record before us, and appellant states that the trial court directed the court reporter *not* to transcribe the notes of testimony from the aborted trial of Nos. 28 and 30. Appellant's brief in Nos. 29 and 31, at 3–4.

Accordingly, we must remand this case to the trial court, and direct that the notes of testimony of May 15 and 16, 1980, be transcribed. Jurisdiction of the appeal in Nos. 29 and 31 (No. 2475 PHL 80) is retained.

## III. APPEAL FROM NO. 44

Appellant raises six issues as well as several sub-issues in this appeal. Those general issues concern: (1) alleged defective nature of the information, (2) sufficiency of the evidence, (3) the trial court's denial of appellant's motion for a mistrial, (4) testimony by a Commonwealth witness not listed prior to trial, (5) cross-examination of appellant revealing other criminal matters, and (6) the trial court's refusal to give a missing witness charge. We address these issues in order.

### 1. Alleged Defective Information

Appellant's first assertion of error is that the trial court erred in denying his motion to quash the information because it was: (a) overly vague and unspecific as to the dates on which the alleged offenses took place, (b) incorrect in citing to a section of the crimes code which had been repealed, and (c) improperly signed by an assistant district attorney in violation of Pa.R.Crim.P. 225(b).

We dealt with these identical issues in appellant's appeal from Nos. 28 and 30, and our determination in that appeal is conclusive here.[28]

## 2. Sufficiency of the Evidence

■■■ The test for evaluating claims based on the sufficiency of the evidence is:

[W]hether, viewing the evidence in the light most favorable to the Commonwealth, and drawing all reasonable inferences favorable to the Commonwealth, there is sufficient evidence to find every element of the crime beyond a reasonable doubt.... The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence.... Moreover, in applying the above test, the entire trial record must be evaluated and all evidence actually received must be considered.... Finally, the trier of fact, while passing upon the credibility of witnesses and the weight to be afforded the evidence produced, is free to believe all, part or none of the evidence. (citations omitted)

*Commonwealth v. Harper*, 485 Pa. 572, 576–77, 403 A.2d 536, 538–39 (1979).

Viewing the evidence in this light, the record reveals the following:

Pamela Sue McMillan, the victim of the crimes in No. 44, became acquainted with the appellant when her family began camping at the Circle "S" Ranch on weekends in the summer. N.T. July 16 and 17, 1980 at 24, 66. In the summer of 1979, Pam was thirteen years old and had known the appellant for three years. *Id.* at 25, 63–64. One weekend in the summer of 1979, Pam's family came up to camp at the Circle "S" Ranch, and at appellant's suggestion, left Pam to help the appellant while his wife was in the hospital.[29] Pam was going to assist the appellant with

---

**28.** The information at No. 44 alleged continuing offenses against the victim from July 23, 1979, and extending for a period of four to five weeks.

**29.** Pam's mother testified that they left Pam with the appellant on Sunday, July 22, 1979. *Id.* at 27. Pam testified that it was in the middle of August. *Id.* at 68.

household chores, and since appellant would not hear the telephone ringing if the hospital called during the night, Pam was to sleep on the couch by the telephone. (The appellant had hearing difficulties and wore a hearing aid). *Id.* at 27, 68. Pam's parents and brothers left on Sunday.

On Sunday, Pam's friend, Joy Paucke, asked her grandmother if Pam could stay the night. Pam slept at Joy's house on Sunday night. *Id.* at 70. On Monday, Pam and Joy went with the appellant to help him cut hay. The appellant drove the tractor, and Pam and Joy took turns driving the pickup truck around to parts of the field in which the appellant was working. The back of the pickup, which was covered with a cap, contained an assortment of tools. *Id.* at 71–72, 79–80. When questioned if anything unusual happened that day at the hayfield, Pam responded that the appellant had "sexual intercourse" with Joy in the back of the pickup truck, and had told her to watch out for cars. *Id.* at 72. Pam was asked to explain what she meant by "sexual intercourse," and after some hesitation and nervousness, was able to specify that a man got on top of a lady and put his penis in her sexual "privates." *Id.* at 76–78. Pam stated that she could see into the open back of the pickup truck. *Id.* at 79. After the appellant had "sexual intercourse" with Joy, he asked Pam and she agreed to have "sexual intercourse" with the appellant.[30] *Id.* at 81. Pam got into the back of the pickup with appellant, he pulled her pants down, and then put his penis between her legs. *Id.* at 82–83. Pam testified that appellant's penis was touching her "private place." *Id.* at 84. This episode lasted just a "couple of minutes," and then the appellant put the tools back in the truck and they drove to the horse barn. *Id.* at 84–85.

Monday night, Joy stayed at the Shirey residence, and Pam and Joy slept in the bunk room while the appellant slept in his own bedroom. *Id.* at 85. The next day, Tues-

**30.** Pam testified that the appellant had threatened her and Joy that if they didn't have sexual intercourse with him, he would tell their parents that they were acting like "lesbians." *Id.* at 81–82.

day, Pam and Joy again helped the appellant in the hayfield. Pam testified that there was a boy riding his motorcycle around in the area, and nothing unusual happened. *Id.* at 86–87. After haying, the appellant dropped Joy off at her home, and he and Pam continued to the Shirey residence. *Id.* at 87.

That night following supper, Pam was in the bunk room and the appellant came in and asked her if she wanted to watch some movies. *Id.* at 88. The appellant set up the projector and showed her two films. The first film depicted a naked woman and two naked men. One man "was on top of [the woman], and the other one was sucking her breasts," and then the two men switched positions. *Id.* at 88–90. The second film portrayed a naked man and a naked woman on a ladder. The naked couple then went into the bedroom and they were "screwing." *Id.* at 90. Pam stated that she hadn't used any other word in court which meant the same thing as "screwing," and she understood the term to mean that a man got on top of a lady and put his penis in the lady's "private spot," and then the man went "up and down and back and forth." *Id.* at 90–91. When the movies ended, the appellant tried to feel Pam's chest, and asked her if he could. Pam kept refusing, and finally appellant quit asking, and went to sleep in his own bedroom. *Id.* at 91–93.

Nothing out of the ordinary happened on Wednesday, Thursday or Friday. The appellant's wife had returned home on Thursday. *Id.* at 95. On Saturday night, while appellant's wife was sleeping, the appellant showed Pam a vibrator. Pam described it as a "white thing that runs with batteries" and indicated that it was ten to twelve inches long. *Id.* at 98. The Commonwealth introduced as Exhibit # 1 a white vibrator that the appellant had turned over to the police. *Id.* at 151. Pam recalled that the appellant had said it was "for girls to use when they don't got their boyfriend or husband." *Id.* at 98. The appellant then put batteries in the vibrator and placed it on her legs. *Id.* at 99. Pam was wearing jeans. *Id.* at 100. Nothing else occurred that night.

No untoward events ensued until Tuesday. The appellant took his wife to the hairdresser's, and then Pam went along with the appellant to work in the hayfield. The appellant tried to pull Pam's pants down, but she refused to let him do so. *Id.* at 100–101.

On Thursday, Pam and Joy again accompanied the appellant to the hayfield. While they were there, the appellant had "intercourse with [her] and Joy." *Id.* at 102. Pam related that while the appellant was on top of her, he told Joy to hold his penis. Appellant's penis was between Pam's legs and she testified that it was "inside of me" and that it hurt. *Id.* at 104–105. Pam told the appellant to get off of her, and he complied. *Id.* at 105.

Pam's parents returned to the Circle "S" Ranch the next day, and she went home with them the following Sunday.

On the basis of this evidence, the jury found the appellant guilty of statutory rape, indecent assault, and corruption of a minor. The appellant argues that the evidence was insufficient to sustain his convictions for statutory rape and corruption of a minor.

As to the sufficiency of the statutory rape conviction, the appellant points to the rule that to constitute the offense of rape, there must be penetration, however slight. *Commonwealth v. Bowes*, 166 Pa.Super. 625, 74 A.2d 795 (1950). Appellant then directs us to Pam's testimony regarding the first incident in the hayfield. While Pam stated that the appellant had "sexual intercourse" with her, she described his activity only as the placement of his penis between her legs "touching" her "private place." N.T. July 16 and 17, 1980, at 81, 84. While we agree that this testimony did not substantiate penetration, appellant overlooks Pam's subsequent testimony regarding the last incident when appellant had Joy fondle his penis while he was on top of Pam:

Q. Where was his [appellant's] penis exactly, Pam?
A. Inside of me.
Q. Inside of you?

A. Yes.

Q. Did it hurt you?

A. Yes.

This is clearly direct evidence of penetration, and it is a longstanding rule that with regard to the element of penetration, the testimony of one witness—the injured person—can be sufficient to sustain a conviction of rape. *Johnson Appeal*, 445 Pa. 270, 284 A.2d 780 (1971); *Commonwealth v. Crider*, 240 Pa.Super. 403, 361 A.2d 352 (1976).

■■■ Appellant's contention that the evidence was insufficient to support the corruption of a minor conviction, relates to the language in which the corruption charge was couched. The information charged that the appellant corrupted or tended to corrupt the morals of the minor, Pamela Sue McMillan, "by showing a child obscene literature, pictures, and two movies of naked men and women engaged in sexual intercourse or oral sex." At the conclusion of the evidence, the appellant moved for a directed verdict on this charge on the basis that the Commonwealth had failed to establish that the movies were "obscene" under the community standards of Potter County. N.T. July 16 and 17, 1980, at 257. As previously discussed, the burden enunciated in *Commonwealth v. LaLonde, supra,* involving the proof of community standards of obscenity, was overruled in 1974 by the case of *Commonwealth v. Rogers, supra. See* discussion *infra* at I. Appeal of Nos. 28 and 30, 5. "Obscenity." This claim of error is without merit.

### 3. Motion for Mistrial

Appellant's third assignment of error is that the trial court abused its discretion in failing to grant a mistrial. Appellant moved for a mistrial three times in response to testimony by Pam on direct examination, which revealed that the appellant had committed crimes against Joy Paucke. In reliance on an assessment that this "other crimes" evidence was inadmissible and highly prejudicial, the appellant maintains that his motion for mistrial should have been granted.

Joy Paucke's involvement with the appellant came out in Pam's direct examination as follows:

Q. Now, when you were out in the hay field, did anything unusual happen to you that day on Monday.

A. Yes.

Q. What was that?

A. He [the appellant] had sexual intercourse with Joy and he told me to watch out for cars.

N.T. July 16 and 17, 1980, at 72.

Q. Pam, during the time that you were staying with the Shirey's, other than the times you have testified, has there been anything that happened between you and Mr. Shirey that you haven't told us about yet?

A. Yes.

Q. Would you tell me what happened, and where it happened?

A. Thursday he was down in the hay field having intercourse with me and Joy.

. . . . .

Q. Will you tell me, Pam, what happened on that—at that time?

A. He told Joy to hold his penis.

Q. He told Joy to hold his penis?

A. Yes.

Q. And what were you doing?

A. He was on top of me while he told her.

*Id.* at 102–104.

Q. Okay. Now, did you talk to him [the appellant] on any other occasion [about these charges]?

A. Yes.

Q. And how did that come about?

A. He called down at our house—he called down at our house before the police knew, and he—

Q. Stop just a second because I couldn't hear what you said. He called down at your house?

A. Yeah, he called down and asked for me, and one time he told us about Joy was pressing charges—

*Id.* at 109.

The trial court denied the repeated motions for a mistrial on the basis that the offenses against Joy were so inextricably woven together with the offenses against Pam, that testimony concerning Joy was necessary in eliciting testimony of appellant's conduct towards Pam. *Id.* at 74, 110–111. To clarify to the jury that they were only to be concerned with the four charges pertaining to Pam McMillan, the trial court gave the following instruction:

THE COURT. Members of the Jury, there may have been reference by this witness to a charge or charges with which we are not here concerned and should not be concerned with them, nor should you make any inference one way or another. You are concerned with four specific charges. Any reference or any testimony or any guess that you make as to anything else is completely irrelevant, and you are instructed to disregard anything else. Now, counsel, you will continue.

*Id.* at 112.

In granting or refusing a motion for mistrial, it is primarily within the trial court's discretion to determine whether prejudice occurred, and that determination will not be reversed absent a flagrant abuse of discretion. *Commonwealth v. Gardner*, 490 Pa. 421, 416 A.2d 1007 (1980); *Commonwealth v. Fields*, 317 Pa.Super. 387, 464 A.2d 375 (1983). We find no error in the trial court's management of the "other crimes" evidence and the denial of appellant's motions for mistrial.

Appellant resorts to the general rule that "other crimes" evidence is usually inadmissible because the commission of one crime is not proof of the commission of another, and the effect of such testimony upon a jury is nevertheless bound to create prejudice against a defendant. *Commonwealth v. Burdell*, 380 Pa. 43, 110 A.2d 193 (1955). Noting the five well-recognized exceptions to the general rule, appellant concludes that none of them fit the instant situation, and,

therefore, the admission of the "other crimes" evidence was improper and resulted in grave prejudice.

Strict compliance to the customary recitation of the rule might lead to this shortsighted result. It is obvious, however, that the infrequently encountered "res gestae" or "same transaction" exception is ideally suited to this situation.[31] The trial court recognized the thrust of the "res gestae" exception by observing that the facts were inextricably woven together, and commenting that the appellant was merely fortunate that he was not charged with the offense against Joy. N.T. July 16 and 17, 1980, at 74. The "other crimes" evidence was proper under the "res gestae" exception.

■■■ The second step of the test for the admissibility of "other crimes" evidence involves the balancing of the probity of that evidence against its prejudicial impact. *Commonwealth v. King, supra.* The trial court must weigh:

> ... on the one side, the actual need for the other-crimes evidence in the light of the issues and the other evidence available to the prosecution, the convincingness of the evidence that other crimes were committed and that the accused was the actor, and the strength or weakness of the other-crimes evidence in supporting the issue, and on the other, the degree to which the jury will probably be roused by the evidence to overmastering hostility.

MCCORMICK, *supra,* at 453; *see also Commonwealth v. King, supra; Commonwealth v. Bradley, supra.*

**31.** By its very nature, this exception rarely surfaces. This is so because, if two crimes were part of the same transaction, compulsory consolidation would be applicable and the two crimes would be tried together—thereby obviating any objection that one crime improperly influenced the other. However, there are instances where two crimes arising from the same transaction are not consolidated—sometimes severance is either desired or inescapable (as where a defendant pleads guilty to one of the crimes), sometimes the Commonwealth chooses to prosecute only one of the crimes, and sometimes consolidation is merely overlooked. Only in these uncommon situations does the circumstance that the crimes are part of the same transaction present itself as an evidentiary exception to permit evidence of one crime to be admitted at a trial of the other.

■ In attempting to apply this balancing test, it is apparent that the "res gestae" situation was not contemplated in the formulation of this second prong of admissibility. While it is possible to isolate and conveniently exclude, if necessary, "other crimes" evidence of a type distinct from the crime charged; we cannot do so with "other crimes" evidence which is part of the criminal event on trial. By definition, "res gestae" or "same transaction" evidence of "other crimes" is an *inseparable* part of the whole deed. Thus, it is nonsensical to endeavor a balancing of prejudice where the exception to the rule against "other crimes" evidence is the "res gestae" or "same transaction" exception.

Accordingly, the trial court did not abuse its discretion in refusing to grant a mistrial. Indeed, the complained of evidence was properly admissible, and the trial court took the further precaution of instructing the jury that only the charges involving Pam were for their consideration.

### 4. Testimony by Surprise Witness

Immediately prior to trial, the appellant requested that the Commonwealth's witnesses be sequestered. At that juncture, the Commonwealth revealed that they planned to call Pam's mother, Carol McMullan.[32] The appellant objected on the basis that Carol McMullan had not been listed as a witness in the information or in the Commonwealth's Answer to Defendant's Request for a Bill of Particulars. The appellant had requested the identification of all witnesses in a Bill of Particulars, and the Commonwealth responded by listing certain witnesses and indicating "Commonwealth may or may not call additional witnesses." N.T. July 16 and 17, 1980, at 5–7.

The trial court allowed Carol McMullan to testify. Her testimony primarily covered the dates on which Pam was left at the Circle "S" Ranch with the appellant, and the family's familiarity with the appellant. Carol McMullan

32. Pam's mother's last name was McMillan during her first marriage, and McMullan following her second marriage. N.T. July 16 and 17, 1980, at 24.

also related that she discovered what had taken place through an investigating officer, and then Pam had confessed "it" to her. *Id.* at 32.

■ Even if a witness is called whose name is not in the complaint or bill of particulars, sufficient prejudice must be found to entitle a defendant to reversal. *Commonwealth v. Layman*, 290 Pa.Super. 244, 434 A.2d 735 (1981). The testimony of the surprise witness here did not convey any crucial or corroborative information about the crimes against Pam. The sole purpose of Carol McMullan's testimony was to supply background information as to the family's connection with the Circle "S" Ranch, and the period during which Pam stayed with the appellant. Significantly, Carol McMullan did not testify as to any actual criminal episodes which may have been narrated to her by her daughter or the investigating officer.[33] Nor did she furnish any circumstantial evidence that the crimes against Pam had been committed. In addition, the appellant fully exercised his opportunity to cross-examine Carol McMullan.

■ Thus, the essence of Carol McMullan's surprise testimony was not sufficiently prejudicial to require reversal of his conviction.

### 5. Cross-Examination of Appellant

On direct examination, the appellant testified that he and his wife went to the police barracks on February 13, 1980, and there he signed a consent to search because "There is nothing in my house I am either ashamed of, or that I am not willing to let you see." N.T. July 16 and 17, 1980, at 195. The police had asked the appellant if he owned a vibrator, and the appellant's wife said she did. They went back to the Shirey residence, and the appellant's wife retrieved the vibrator and turned it over to the police. *Id.* at 193–94, 197.

On cross-examination, the prosecutor tried to question the appellant about what he meant by stating that he had

---

**33.** If she had, a hearsay objection would have been valid.

nothing to hide in his house. *Id.* at 206. The prosecutor was confusing in his questioning; but upon close examination, it is evident that the original point he was trying to make was that, at the time the appellant told the police at the barracks that he had nothing to hide in his house, he *knew* that the vibrator was there. *Id.* at 207.

The appellant had difficulty in comprehending the prosecutor's questions, and after four pages of testimony on this subject, *Id.* at 206–10, the appellant's counsel interjected. Appellant's counsel stated that the prosecutor's questions had been answered, and that he was afraid that continued questioning on this subject would indicate to the jury that there was possibly other material in the house at an earlier time. *Id.* at 210–11. The trial court ruled that the prosecutor had a right to continue this line of questioning, but cautioned him to be wary of framing his questions to suggest facts beyond this set of charges. *Id.* at 212–14.

Cross-examination continued in this vein for three more pages of testimony, and then the following exchange took place:

Q. Can you tell me whether you meant your answer relative to the having nothing in your house to be ashamed of to apply only to February 13, 1980?

A. What was the date now?

Q. February 13, 1980, the date that they came to your house to ask for the vibrator?

A. If that's the date that's on the paper, that's the date. I don't recall.

Q. Did you mean your statement to apply only to that date?

A. I am not getting you.

Q. When you said I have nothing in my house to be ashamed of, that there is no need to go to all this crap, I think is what you said, did you mean that you had nothing in your house on February 13, 1980 to be ashamed of, or that you never had anything in your house to be ashamed of?

MR. BERTANI: Your honor, again, according to my prior objection, we make a Motion for a Mistrial.
THE COURT: Very well, motion denied. You may answer the question. Did you understand the question?
A. We are speaking of the very day about the vibrator thing?
Q. Right. That's the day I am talking about, and I am asking you—
A. At that day, there was nothing in my house of which I had to hide.
Q. Very well.
MR. BERTANI: May we approach the Bench, your Honor.

*Id.* at 217–18. Appellant again moved for a mistrial on the basis that, in eliciting testimony to the effect that on that *particular* day there was nothing to be ashamed of in the house, the jury could infer that on some *other* day, there might have been something to be ashamed of in the house. Thus, appellant asserts that this questioning improperly referred to other criminal matters.

Cross-examination is a vital and fundamental part of a fair trial, and denial of the right of full cross-examination of a witness on the substance of his direct testimony is error of a constitutional dimension. *Commonwealth v. Lopinson*, 427 Pa. 284, 234 A.2d 552 (1967), *vacated on other grounds*, 392 U.S. 647, 88 S.Ct. 2277, 20 L.Ed.2d 1344 (1968). The scope of cross-examination extends beyond the subjects testified to on direct examination, and includes the right to examine on any facts tending to refute "inferences or deductions" arising from matters testified to on direct. *Id.* 427 Pa. at 300, 234 A.2d at 562; *see also Commonwealth v. Sweet*, 232 Pa.Super. 372, 335 A.2d 420 (1975). The trial court has broad discretion in ruling on the parameters of cross-examination, and those rulings will not be reversed absent a clear abuse of discretion or error of law. *Commonwealth v. Greene*, 469 Pa. 399, 366 A.2d 234 (1976).

■ The appellant's testimony on direct examination to the effect that he had nothing in his house to be ashamed of, opened the door to the Commonwealth's queries on this subject. We find no abuse of discretion.

### 6. Missing Witness Charge

The Commonwealth, in its answer to the appellant's request for a Bill of Particulars, listed two eyewitnesses, Joy Paucke and Michelle Marshall. Neither Joy nor Michelle testified for the Commonwealth,[34] and appellant requested that a missing witness charge be given. N.T. July 16 and 17, 1980, at 261–269.

In *Commonwealth v. Jones*, 455 Pa. 488, 317 A.2d 233 (1974), our supreme court articulated the general missing witness rule:

"[W]hen a potential witness is available to only one of the parties to a trial, and it appears this witness has special information material to the issue, and this person's testimony would not be merely cumulative, then if such party does not produce the testimony of this witness, the jury may draw an inference it would have been unfavorable. See McCormick, Law of Evidence, 534 (1954). See Also *Bentivoglio v. Ralston*, 447 Pa. 24, 288 A.2d 745 (1972), and *Commonwealth v. Wright*, 444 Pa. 536, 282 A.2d 323 (1971)." *Commonwealth v. Moore*, 453 Pa. 302, 305, 309 A.2d 569, 570 (1973).

*Id.* 455 Pa. at 495, 317 A.2d at 237.

■ The *Jones* court additionally outlined the special situation where the Commonwealth had previously listed the witnesses for trial:

"There is no duty on the Commonwealth to call witnesses whose names appear on a bill of indictment or even eye witnesses, if it believes after examination or investigation that their testimony is unreliable, or unworthy of belief, or surplusage or irrelevant. The law in such a case

---

**34.** The Commonwealth called the name of Joy Paucke, but immediately thereafter "withdrew" her because her testimony could not be confined to the dates on the information. Joy never took the stand.

merely requires a District Attorney to notify the Court and defense counsel that he does not intend to call certain persons whose names appear on the bill of indictment as Commonwealth witnesses. *Commonwealth v. Palermo,* 368 Pa. 28, 81 A.2d 540; *Commonwealth v. Deitrick,* 221 Pa. 7, 14, 15, 70 A. 275. See also *Commonwealth v. Danz,* 211 Pa. 507, 522, 60 A. 1070; *Commonwealth v. Giacobbe,* 341 Pa. 187, 195, 19 A.2d 71 . . . ."

*Id.* 455 Pa. at 490–91, 317 A.2d at 234 (Quoting *Commonwealth v. Schmidt,* 437 Pa. 563, 567, 263 A.2d 382, 384 (1970)). The purpose of the requirement that notice be given to a defendant regarding a decision not to call listed witnesses, is to provide the defendant the opportunity to call the witnesses himself, if he so desires. *Id.*

In *Commonwealth v. Gilman,* 485 Pa. 145, 401 A.2d 335 (1979), our supreme court further refined the law pertaining to notice to a defendant that listed witnesses would not be called. In *Gilman,* the listed witness was unable to testify through no fault of the Commonwealth, and the defendant was not given sufficient notice to call him. Since the defendant in *Gilman* neither asked to call the witness at any time, nor contended that he would have called him if he were available, the court found no error in the trial court's refusal to allow comment by defendant's attorney that an adverse inference should be attached to the Commonwealth's failure to call the listed witness.

We find *Gilman* controlling. Here, the appellant never expressed a desire to call either Joy or Michelle upon notice that they would not be testifying. Joy was certainly available to him because she had been subpoenaed by the Commonwealth and was present for the trial. N.T. July 16 and 17, 1980, at 166, 265; *see* footnote 34, *supra.* No mention was made in the record as to Michelle's availability; however, the appellant did not indicate that he would have called her if she had been available. Even assuming that Michelle was unavailable to the appellant, it did not appear that she had any special information material to the case— from the testimony at trial, Michelle was never involved in

any of the incidents concerning Pam. Thus, there was no error in the trial court's refusal to give the proffered missing witness charge.

Appellant having raised no ground for reversal, the Judgment of Sentence at No. 44 (No. 2476 PHL80) is affirmed.

JOHNSON, J., files a concurring and dissenting opinion.

JOHNSON, Judge, concurring and dissenting:

I join in the disposition of the appeals from the judgments of sentence at Nos. 28, 30 and 44 of 1980. I also join in the majority's disposition of appellant's claim of defective informations in the appeal at Nos. 29 and 31.

I must respectfully dissent from the majority's analysis of the double jeopardy claim at Nos. 29 and 31 of 1980 and its determination to remand that case for transcription of the notes of testimony of May 15 and 16, 1980. In my view, an examination of the trial court's declaration of mistrial to determine whether that declaration was manifestly necessary is inappropriate on the law as I understand it.

Following a trial at Nos. 28 and 30 on May 15 and 16, 1980, the jury was unable to reach a verdict and the trial judge declared a mistrial. On October 22 and 23, 1980, retrial was held on these same charges.

In the United States Supreme Court's last term, the Court, in deciding *Richardson v. U.S.*, —— U.S. ——, 104 S.Ct. 3081, 82 L.Ed.2d 242 (1984), reaffirmed the principle "that a failure of the jury to agree on a verdict was an instance of 'manifest necessity'". *Id.* at 104 S.Ct. 3085. Because *Richardson* holds that "a hung jury is not an event which terminates the original jeopardy," *Id.* at 104 S.Ct. 3086, there would be no reason to review the transcript of appellant's first trial.

I therefore must dissent from the majority's remand of the appeal at Nos. 29 and 31 of 1980 for the purpose of reviewing the proceedings at the first trial of Nos. 28 and 30.

Since I find no merit in the double jeopardy argument, I would dispose of the other issues raised by appellant on this separate appeal. Finding the arguments concerning the denial of a mistrial motion, the failure to give a missing witness charge, and the sufficiency of the evidence to be without merit, I would affirm the judgment of sentence at Nos. 29 and 31.