577 A.2d 609

**COMMONWEALTH of Pennsylvania**

v.

**John K. FRANK, Appellant.**

Superior Court of Pennsylvania.

Argued May 22, 1990.

Filed July 6, 1990.

414

Glenn D. McGogney, Allentown, for appellant.

John T. Robinson, Dist. Atty., Selinsgrove, for Com., appellee.

Before OLSZEWSKI, MONTEMURO and FORD ELLIOTT, JJ.

MONTEMURO, Judge:

The appellant, John K. Frank, has appealed from the judgment of sentence entered on December 8, 1989, by the Court of Common Pleas of Snyder County, ordering him to undergo imprisonment for a period of not less than six years and three months nor more than fifteen years for the offense of rape by forcible compulsion or threat of forcible compulsion. *See* 18 Pa.C.S.A. § 3121(1) and (2). Appellant received the same sentence for the offense of involuntary deviate sexual intercourse as defined pursuant to 18 Pa.C.

S.A. § 3123(5). Appellant's sentences are to be served consecutively. The appellant presents six issues to this Court for review, which shall be addressed seriatim. Following a careful consideration of the issues raised by the appellant, in light of the record before us, we affirm.

■ Appellant initially contends that the trial court erred in admitting the testimony of six witnesses, offered by the Commonwealth to establish a "common scheme, plan or design embracing commission of two or more crimes so related to each other that proof of one tends to prove others." *Commonwealth v. Peterson*, 453 Pa. 187, 197–198, 307 A.2d 264, 269 (1973). The victim involved in the instant case, T.Y., first met the appellant when T.Y. was eleven or twelve years of age. At the time of trial in the case at bar, T.Y. was seventeen years of age. T.Y. testified that, prior to the time he first met with appellant, he had been "kicked out from where my real parents live," and had resided in four or five different foster homes. N.T., May 23, 1989, at 41. T.Y. was taken to see the appellant by his adoptive mother at the time, P.Y. Appellant was a therapist and contracted with local social service agencies to provide counselling to troubled youngsters and their families. T.Y. testified that he was taken to see the appellant to be counselled concerning behavioral problems: lying and stealing. *Id.* Although the exact number of individual counselling sessions with the appellant was disputed at trial, appellant did counsel T.Y. from January of 1982 through February of 1983.

T.Y. was counselled in an office located within the appellant's Selinsgrove home. T.Y. testified that after a few months, the appellant requested that T.Y. sit on the appellant's lap for counselling. *Id.* at 44. After a few weeks of sessions where T.Y. would sit on appellant's lap, appellant began requesting that T.Y. kiss the appellant on the cheek or on the lips. *Id.* at 45. Again after a few weeks of this type of conduct during the sessions, T.Y. testified that the appellant began fondling T.Y.'s penis while T.Y. sat on his lap. *Id.* at 46. T.Y. stated that appellant, during the next

several counselling sessions, would pull T.Y.'s pants down and masturbate T.Y. *Id.* at 48. T.Y. testified that throughout this progression, he was afraid and confused. At almost every session, appellant would warn T.Y. that if he revealed what was occurring during the counselling sessions to anyone, appellant would "screw up [T.Y.'s] adoption and ... hurt somebody that was close to [T.Y.]." *Id.* at 49. T.Y. testified that as time passed, the appellant added mutual oral intercourse to the sessions. Then, after several sessions involving this type of conduct, T.Y. testified that the appellant had T.Y. bend over a desk, and then the appellant engaged in anal intercourse with T.Y. *Id.* at 54. Anal intercourse in this manner occurred during two or three sessions. *Id.* at 55.

The Commonwealth, following the testimony of T.Y., was permitted to introduce the testimony of six individuals who, like T.Y., had been counselled by the appellant during their adolescence. Each of these witnesses testified that the appellant had initiated some type of sexual contact with them during counselling sessions. Appellant contends that this was prejudicial error, necessitating the grant of a new trial. The trial court ruled that the testimony of the witnesses was admissible to establish a common plan, scheme or design. Prior to examining the testimony of these witnesses, we review the precedent upon which we must rely in considering whether the admission of the testimony of these Commonwealth witnesses was prejudicial error.

"One of our most fundamental and prized principles in the administration of criminal law is that a distinct crime, except under certain special circumstances, cannot be given in evidence against a defendant who is being tried for another crime. This is because the fact that a person has committed one offense is not proof that he has committed another and because the effect of the testimony upon a jury is nevertheless bound to create prejudice and an emotional reaction on their part against the defendant." *Commonwealth v. Burdell,* 380 Pa. 43, 47, 110 A.2d 193, 195 (1955). One "special circumstance" which may provide a basis for

the admission of evidence of other criminal acts by a defendant has become known as the common plan, design or scheme exception. This Court has recognized that to fit within this exception, the "crimes must embrace distinctive elements and be so nearly identical as to bear the 'signature' or be the 'handiwork' of the same person." *Commonwealth v. Shirey*, 333 Pa.Super. 85, 124, 481 A.2d 1314, 1335 (1984) (citation omitted).

The appellant has directed us to our decision in *Commonwealth v. Bradley*, 243 Pa.Super. 208, 364 A.2d 944 (1976), wherein the appellant was a member of the supervisory staff of an institution for mentally retarded children known as the Hillcrest School. The appellant in *Bradley* had been convicted of performing involuntary deviate sexual intercourse with a thirteen year old resident of the institution during December 1968. During trial, the Commonwealth called four former residents of the Hillcrest School, and these individuals testified that either they had witnessed the appellant performing sexual acts with other residents of the institution, or that they personally had been been forced to engage in sexual acts, such as anal or oral intercourse, with the appellant. The *Bradley* Court held that the admission of this evidence had been erroneous, because it did not fit within the common plan exception:

> The alleged acts of sodomy in the case at bar could not be dated with precision, but some acts may have occurred almost three years before the December 1968 incident charged in the indictment, and some acts may have occurred as much as three years after December, 1968. These random and remote acts are not relevant in establishing that appellant acted according to an explicit and premeditated plan on December, 1968.

*Id.*, 243 Pa.Superior Ct. at 214, 364 A.2d at 946–947. Further, the *Bradley* Court recognized that there was nothing so distinctive about the alleged acts of oral and anal sodomy "as to be tantamount to the appellant's unique 'signature.'" *Id.*, 243 Pa.Superior Ct. at 214 n. 2, 364 A.2d at 947 n. 2.

In discussing the common plan exception as it relates to sex offenses, the Court in *Bradley* distinguished the decision of the Pennsylvania Supreme Court in *Commonwealth v. Kline*, 361 Pa. 434, 65 A.2d 348 (1949). In *Kline*, the appellant had been convicted for a rape occurring on October 20, 1946, and the Commonwealth had presented the testimony of a woman who stated that during approximately the same time, the appellant had exposed himself to her. The Supreme Court found no error in the admission of this testimony and in doing so, opined:

> The word 'design' implies a plan formed in the mind. That an individual who commits or attempts to commit abnormal sex offences is likely to have such a mental 'plan' finds recognition in the fact that when a defendant is charged with the commission of a sexual offence the law is more liberal in admitting as proof of his guilt evidence of similar sexual offences committed by him than it is in admitting evidence of similar offences when a defendant is charged with the commission of non-sexual crimes.... [I]f A is being tried for rape or attempted rape of Y the fact that recently he raped or attempted to rape X is admissible in evidence because it tends to prove that he possessed such an abnormal mental or moral nature as would likely lead him to commit the offence charged.

*Id.*, 361 Pa. at 443–444, 65 A.2d at 351. In *Bradley*, this Court stated that the more liberal "mental plan" exception, recognized in *Kline* as available for cases involving sex offenses, should not be applied to evidence of events occurring more than one year prior to the offense charged in the indictment, as the inference of a common mental plan set forth in *Kline* would be rendered too weak and speculative under such circumstances. *Bradley, supra* 243 Pa.Super. at 215, 364 A.2d at 944.

We do not and need not rely upon the more liberal mental plan exception applicable to sex offenses as set forth in *Kline.* Several of the witnesses in the present case testified concerning events which occurred outside of the "one

year cutoff" announced by our decision in *Bradley*. Moreover, we note that in *Commonwealth v. Shively*, 492 Pa. 411, 424 A.2d 1257 (1981), two justices, with two justices concurring in the result and two justices dissenting, were of the opinion that *Kline* should be overruled.[1] Finally, in finding no error in the admission of the testimony of the six witnesses here, we have determined that such evidence, when judged under the standard employed in cases involving non-sex crimes, satisfies the requisites of the common plan exception to the general rule that evidence of other criminal activity on the part of a criminal defendant in not admissible evidence.

We are cognizant of the fact that a determination of whether evidence is admissible under the common plan exception must be made on a case by case basis in accordance with the unique facts and circumstances of each case. However, we recognize that in each case, the trial court is bound to follow the same controlling, albeit general, principles of law. When ruling upon the admissibility of evidence under the common plan exception, the trial court must first examine the details and surrounding circumstances of each criminal incident to assure that the evidence reveals criminal conduct which is distinctive and so nearly identical as to become the signature of the same perpetrator. Relevant to such a finding will be the habits or patterns of action or conduct undertaken by the perpetrator to commit crime, as well as the time, place, and types of victims typically chosen by the perpetrator. Given this initial determination, the court is bound to engage in a careful balancing test to assure that the common plan evidence is not too remote in time to be probative. If the evidence reveals that the details of each criminal incident are nearly identical, the fact that the incidents are separated by a lapse of time will not likely prevent the offer of the evidence unless the time lapse is excessive. Finally, the trial court must assure that

1. We note that recently a panel of this Court, in *Commonwealth v. Powers*, 395 Pa.Super. 231, 577 A.2d 194 (1990); Del Sole, J., dissenting), relied upon *Commonwealth v. Kline*, 361 Pa.Super. 434, 65 A.2d 348 (1949).

the probative value of the evidence is not outweighed by its potential prejudicial impact upon the trier of fact. To do so, the court must balance the potential prejudicial impact of the evidence with such factors as the degree of similarity established between the incidents of criminal conduct, the Commonwealth's need to present evidence under the common plan exception, and the ability of the trial court to caution the jury concerning the proper use of such evidence by them in their deliberations.

This Court, in *Commonwealth v. Newman*, 388 Pa.Super. 146, 564 A.2d 1308 (1989), discussed the subject of the common plan exception in a case involving two occurrences of rape upon patients of a hospital where the defendant was employed as an x-ray technician. The occurrences were separated by an eighteen month interval. The *Newman* Court recognized that "the shared similarities which produce the conclusion of 'common design' may only be found ... in the acts which compose the crime and *which are performed by the perpetrator*." *Id.*, 388 Pa.Superior Ct. at 149–150, 564 A.2d at 1310 (emphasis added). The *Newman* Court determined that neither rape would be admissible in trial of the other, because, upon scrutiny of the details of the two crimes, the similarities necessary to support the application of the common plan exception were missing. "The essential elements of the act of rape, as well as other sexual crimes, will necessarily produce any number of similar characteristics when two acts of rape are scrutinized for shared features, particularly where, as we have here seen, there is commonality of roles and situs attendant the criminal episodes." *Id.*, 388 Pa.Superior Ct. at 151–152, 564 A.2d at 1311.

A similar result was reached in *Commonwealth v. Kasko*, 322 Pa.Super. 62, 469 A.2d 181 (1983), wherein we held that the trial court had erred in consolidating the cases against the defendant. In *Kasko*, the defendant was charged with molesting his girlfriend's six-year-old niece in February or March of 1980. The molestation, which involved anal intercourse, occurred in the presence of the defendant's girlfriend. The defendant was also charged for

an incident occurring in December of 1980 or January of 1981, which involved the defendant encouraging children in his family, a four-year-old girl and a five-year-old boy, to have indecent contact with each other. This Court determined that the common plan exception was not applicable under the circumstance present in *Kasko* on the basis that:

> ... the two cases were separated by a substantial period of time and involved different victims. They occurred under dissimilar circumstances in that one allegedly occurred in the presence of appellant's girlfriend, later his wife, while the other did not. One case involved both a young boy and a young girl, whereas the other only involved a young girl. Finally, the misconduct alleged in this case is, sadly, not as rare as it should be, but is rather a common form of child abuse.

*Id.,* 322 Pa.Superior Ct. at 68–69, 469 A.2d at 185. *See also Commonwealth v. Shirey,* 333 Pa.Super. 85, 481 A.2d 1314 (1984).

In contrast to the holdings in *Newman* and in *Kasko,* our Supreme Court, in *Commonwealth v. Hughes,* 521 Pa. 423, 555 A.2d 1264 (1989), has recently relied upon the common plan exception to affirm the finding that evidence of one rape, committed on January 5, 1980, was admissible in a prosecution for a rape and murder committed at an earlier date: March 1, 1979.[2] The Court determined that the similarities of the two crimes represented the unique signature of the appellant:

> ... (1) both crimes involved young females (Graham was nine; Oquendo was twelve); (2) both victims were non-Caucasian ... (3) both crimes occurred during daylight; (4) both crimes took place within a four-block radius; (5) both crimes took place within a five-minute walk from Appellant's home; (6) both crimes involved circumstances in which the victim was lured or strong-armed off the street; (7) both victims were taken to upstairs bedrooms of vacant buildings; (8) in both crimes the assailant

---

**2.** We note that the Supreme Court in *Commonwealth v. Hughes,* 521 Pa. 423, 555 A.2d 1264 (1989), did not cite or rely upon its decision in *Commonwealth v. Kline,* 361 Pa. 434, 65 A.2d 348 (1949).

ordered the victims to undress; (9) both crimes involved rape, other sex acts (Graham was anally; Oquendo was orally), and manual strangulation; and (10) both crimes involved circumstances in which the accused and the victims previously were acquainted.

*Id.* 521 Pa. at 459, 555 A.2d at 1282. Additionally, Ms. Oquendo knew the appellant as "Peanut" and, at the Graham crime scene, the letters "PEA" had been burned into the ceiling. *See also Commonwealth v. Buehl,* 510 Pa. 363, 508 A.2d 1167 (1986).

We also note the decision reached by our Court in *Commonwealth v. King,* 290 Pa.Super. 563, 434 A.2d 1294 (1981), wherein we relied upon the common plan exception to find that two cases of sexual assault were properly consolidated.[3] We find the facts of *King* particularly analogous to the facts underlying the present appeal. In *King,* both victims had responded to an ad in the newspaper placed by MBX of Pennsylvania, which offered money for the applicant's photographs, to be taken by an MBX professional photographer. Both victims completed applications to MBX, which had no offices but used the homes of the modeling "students" for photography sessions. Appellant met with the two victims after the victims responded to the ad. One victim was lured by the appellant to an isolated location on the pretext of visiting the residence of another MBX model. There, this victim was raped and otherwise sexually assaulted by appellant. The second victim was sexually assaulted by appellant when she was alone with him in her home for a photography session. "In sum, both the Clayton and St. Cyr cases are promoted by MBX, which was used by appellant as a means of contacting, isolating and attacking the two victims. The attacks thus constituted a common scheme to use MBX as a vehicle for appellant to gain access to young women for the purpose of sexual gratification." *Id.* 290 Pa.Super. at 576, 434 A.2d at 1300. *See also Commonwealth v. Gibbons,* 379 Pa.Super. 285,

---

**3.** In this decision, *Commonwealth v. Kline,* 361 Pa. 434, 65 A.2d 348 (1949), was not cited or otherwise relied upon.

549 A.2d 1296 (1988) (the common plan exception would justify the consolidation and admission of evidence regarding each of six robberies charged against the appellant because of the following similarities: each of the six victims was a deliveryman in the process of making a delivery in the early afternoon; all offenses occurred within a five and one-half week period within the same vicinity; all victims were robbed at knifepoint by a single actor and had money taken directly from their pants pockets).

Turning now to the case presently before us, we have carefully reviewed the testimony of the six witnesses who appeared for the prosecution. We are convinced that the appellant's actions as to each of these individuals represented admissible evidence under the common plan exception. The similarities between the occurrences described by these six witnesses and the victim, T.Y., were not insignificant details. Rather, the similarities are striking and represent the unique signature of this appellant. We need not consider whether the testimony of one or only a few of these witnesses would have been admissible. Issues concerning the admissibility of evidence must be determined on a case by case basis. Today, on the record before us, we find that the testimony of the six witnesses, considered as a whole, was properly admitted as evidence of a common plan or scheme.

All of the witnesses knew the appellant in the context of a counselor-patient relationship. They had met the appellant during their adolescence, when they were experiencing emotional, behavioral, or psychological difficulties. Their need to meet with a counselor stemmed from their common pasts as children who had moved between various foster homes and orphanages.[4] The witnesses uniformly testified that they were counselled by the appellant with no other adult in the room, behind closed doors. This counselling

4. The only exception to this appears to be B.P., who did not testify as to the reasons for his meeting with appellant. At an earlier proceeding, B.P. had testified that he was taken to see the appellant because he was experiencing psychological problems. Op. of Trial Court, October 19, 1989, at 7.

either occurred in appellant's home office in Selinsgrove or in alternate counseling headquarters in a private home in York, Pennsylvania. All of the witnesses testified that at first, the appellant would have them sit on his lap for counselling. With the exception of B.P. and A.C., the witnesses testified that appellant would then have the young men kiss him. All of the witnesses testified that at some point during their counselling with the appellant, usually after a series of visits, the appellant pulled their pants down and masturbated them. One of the witnesses, A.C., also testified that the appellant had engaged in oral intercourse with him.

Significantly, all of the witnesses testified as to the patterned manner in which the appellant set the stage for his sexual advances.[5] In the case at bar, T.Y. testified that he was confused and afraid during his meetings with the appellant, and that appellant had threatened to ruin his adoption or to harm someone close to T.Y. in the event that T.Y. revealed what was occurring during his sessions with the appellant. A.V. testified that at the time he was molested by the appellant, he "was in the process of wanting a family, to be adopted...." N.T. May 24, 1989, at 51. He testified that he never reported the incidents with the appellant because "I was afraid that they wouldn't adopt me and they wouldn't believe me...." *Id.* A.C. testified that at the time he was meeting with appellant in appellant's Selinsgrove office, "... it just seemed like everything in my whole life at the time was going wrong, I wanted to get on to my real mother and things just wasn't working out, everything just seemed to be coming down.... [Appellant] made me certain promises like he would try to help me get on to my mother. He guided me and promised to do

---

**5.** B.P., who apparently met with appellant only once due to some family and psychological problems which B.P. was experiencing at the time, did not testify at length concerning the circumstances of his meeting with appellant. However, he testified that things occurred during his session with the appellant that "you don't do in a normal counselling session." *Id.* at 168. B.P. testified that after he was molested by appellant, he refused to see the appellant again. *Id.* at 170.

all the things he was saying and doing.... I mean he did everything that would seem to be in, you know, like he was your friend." *Id.* at 24–25.

Likewise, R.G. testified that the appellant told R.G. that he loved him. N.T., May 23, 1989, at 157. When questioned as to why he had permitted the appellant to masturbate him, R.G. testified that "[a]t that period of life, when you're the age—when you're being put up for adoption, you're very insecure. Mr. Frank was a person that at one time, I felt trusted, that I could trust in him.... [Appellant] said there was nothing wrong with [the masturbation.]" *Id.* at 166. D.K. similarly testified that appellant told D.K. that he loved him. *Id.* at 174. D.K. also testified that he trusted the appellant and, because he was young at the time, he did not know that the conduct occurring between them was wrong. *Id.* at 176. M.K. testified that he was up for adoption at the time he was molested by the appellant. M.K. testified that when he told his foster parents about the sexual conduct of the appellant, appellant denied it and called M.K. a liar. M.K. then decided to tell his foster parents that he had lied to them, because his foster parents "had [appellant] up on a pedestal, and nobody was going to believe me because I had just come from an orphanage, and they thought I was mentally disturbed." *Id.* at 186.

The testimony of the six witnesses was admissible because, as a whole, the testimony indicated a calculated, continuous, and uninterrupted pattern, plan or scheme of action on the part of this appellant with reference to appellant's troubled, and obviously vulnerable, adolescent patients. The patients, at least initially, apparently viewed the appellant as a person of authority and as a professional person, respected in the community and by their foster or adoptive parents, who was purportedly able to help them to find or to keep a home and a family. Appellant typically made the patients feel close to him by having them sit on his lap, by having the patients kiss him, by promising to help them, by telling the patients he loved them. All of

these actions were done by the appellant with the knowledge that these youths had experienced difficult childhoods and were then experiencing adjustment problems or other emotional, psychological or behavioral problems. A review of the testimony of all of the witnesses reveals they were typically frightened or confused and particularly vulnerable to appellant's advances, because, at the time of their counselling sessions with the appellant, they believed appellant had the power to help or hinder their quest for a stable family life.

We reject the argument advanced by appellant that these incidents, some occurring three or four years prior to the criminal acts underlying the conviction, were too remote to be deemed admissible. "Remoteness ... is but another factor to be considered in determining if the prior crime tends to show that the same person committed both crimes." *Commonwealth v. Shively,* 492 Pa. 411, 416, 424 A.2d 1257, 1259 (1981). *See also Commonwealth v. Donahue,* 519 Pa. 532, 549 A.2d 121 (1988). The trial court did not abuse its discretion in finding that the incidents were not too remote in time to be probative, because the trial court viewed these events as a continuous, uninterrupted pattern or scheme of conduct on the part of the appellant in his role as a therapist. *See Commonwealth v. Gibson,* 363 Pa.Super. 466, 526 A.2d 438 (1987). Given the degree of similarity in the details of each of the six experiences of these witnesses and the testimony of the victim, T.Y., the approach undertaken by the trial court in evaluating this proffered evidence as a whole was not error. Indeed, the relevancy of this evidence rested in large part upon the fact that the evidence indicated a recurring sequence of acts by this appellant over a continuous span of time, as opposed to random and remote acts. *See Commonwealth v. Bradley,* 243 Pa.Super. 208, 214, 364 A.2d 944, 946 (1976). *See also State v. Morowitz,* 200 Conn. 440, 512 A.2d 175 (1986) (circumstances of prior sexual assault of female patient by defendant, a podiatrist, was sufficiently similar to that of present offense to be probative of a common design or plan;

in both offenses, defendant exploited his professional position to isolate, sedate, and sexually assault young female patients with the aid of tranquilizing drugs).

Finally, appellant contends that the testimony of the six witnesses should have been excluded, because the prejudicial impact of the evidence outweighed the probative value. We disagree. The experiences of the victim, T.Y., and the six witnesses vis-a-vis the appellant possessed a high degree of similarity when the circumstances of the experiences and the details of the actions on the part of the appellant are carefully considered. The Commonwealth's need for the evidence was not minimal in light of the victim's failure to promptly reveal the fact that he had been sexually molested by the appellant, and the evidence concerning the victim's contemporaneous sexual relationship with his adoptive brother. Moreover, the jury was carefully cautioned by the trial court on three different occasions concerning the limited purpose for which the evidence of other criminal acts on the part of the appellant could be considered by the jury in their deliberations. *See Commonwealth v. Billa*, 521 Pa. 168, 555 A.2d 835 (1989). Finally, and significantly, the appellant testified during direct examination that it was his style of counselling to have the child or adolescent patient sit on his lap, and to "frequently hold the child, hold the child closely.... [and] on occasion, kiss the child on the cheek or have that returned." N.T., May 24, 1989, at 103. Appellant further testified that he had performed physical examinations on his patients, specifically naming R.G., D.K., M.K., and B.P. *Id.* at 123–124. Further, appellant testified as follows:

Q. Did you ever have [R.G.] remove his pants and his undershorts to do an examination?

A. Yes.

Q. Exactly what did that examination consist of?

A. Standard physical examinations, what I would do is ask, what are your concerns, what do you fear and that would be upon comparison of a child to other people or the way he thought he should be or whatever. When the

child revealed his fantasy, then I would explain his anatomy and say all right, it was the usual examination, development, testicular development, palpation or whatever and say here's what's going on....

*Id.* at 124–125. In light of the record before us, considered as a whole, the trial court did not err in determining that evidence of other criminal acts committed by the appellant was not too prejudicial to be presented to the finder of fact.

We are mindful that in a case involving the sexual molestation of children, there is certainly a very real danger that the jury will be unduly inflamed by hearing evidence of other similar criminal acts on the part of the criminal defendant. The heinous nature of such crimes is the subject of social outrage, and naturally and properly so. For this reason, we believe that our holding today represents the rare case, where, due to the specific content of the defendant's testimony and the striking similarities surrounding the evidence of other criminal acts as compared to the victim's testimony, prejudice was not too great.

As a second issue, the appellant contends that the trial court should have granted his motion for a demurrer as to the charge of rape, because the Commonwealth failed to prove the element of forcible compulsion or threat thereof beyond a reasonable doubt. *See* 18 Pa.C.S.A. § 3121(1) and (2). Our Supreme Court has determined that "forcible compulsion" as used in Section 3121 "includes not only physical force or violence but also moral, psychological or intellectual force used to compel a person to engage in sexual intercourse against a person's will." *Commonwealth v. Rhodes*, 510 Pa. 537, 555, 510 A.2d 1217, 1226. A determination of forcible compulsion or the threat thereof is to be made based upon the totality of the circumstances in a particular case:

Significant factors to be weighed in that determination would include the respective ages of the victim and the accused, the respective mental and physical conditions of the victim and the accused, the atmosphere and physical setting in which the incident was alleged to have taken

place, the extent to which the accused may have been in a position of authority, domination or custodial control over the victim, and whether the victim was under duress. This list of possible factors is by no means exclusive.

*Id.*, 510 Pa. at 556, 510 A.2d at 1227. In *Rhodes*, the victim of the rape offense was an eight year old neighbor of the defendant, and had known the defendant for approximately three years. When the defendant asked the victim whether she wanted to go somewhere with him, he led her to an empty room on the second floor of an abandoned building. The victim told the defendant to "stop" touching her, but he proceeded to have both vaginal and anal intercourse with her. Finding sufficient evidence to support a finding of forcible compulsion or threat of forcible compulsion, the Supreme Court opined:

There is an element of forcible compulsion, or threat of forcible compulsion that would prevent resistance by a person of reasonable resolution, inherent in the situation in which an adult who is with a child who is younger, smaller, less psychologically and emotionally mature, and less sophisticated than the adult, instructs the child to submit to the performance of sexual acts. This is especially so where the child knows and trusts the adult. In such cases, forcible compulsion or the threat of forcible compulsion derives from the respective capacities of the child and the adult sufficient to induce the child to submit to the wishes of the adult ("prevent resistance"), without the use of physical force or violence or the explicit threat of physical force or violence. As Judge Cavanaugh noted in his dissenting opinion in this case, "the illicit commands of this twenty year old (man) in an isolated and abandoned room were ... an imperative which gave the (eight year old) child victim no alternative but submission to appellant's corrupt scheme."

*Id.*, 510 Pa. at 557–558, 510 A.2d at 1227. *See also Commonwealth v. Dorman*, 377 Pa.Super. 419, 547 A.2d 757 (1988) (evidence sufficient to establish element of forcible compulsion where defendant, the 38–year–old uncle of the

victim, age thirteen, drove the victim to a remote wooded area, disrobed and raped victim despite victim's protest of "don't").

Returning to the facts of the case at bar, we are convinced that the Commonwealth presented sufficient evidence to prove that the victim, T.Y., submitted to sexual intercourse with the appellant under forcible compulsion or threat thereof. T.Y., at the age of eleven or twelve, was taken to see appellant by his then adoptive mother. Due to the fact that his adoptive mother wanted T.Y. to receive counselling, T.Y. met with the appellant, alone, in appellant's office, behind closed doors. Appellant occupied a position of authority such that it may be reasonably inferred that the victim would feel coerced to submit to appellant's demands out of a sense of duty to obey not only the appellant, but also the wishes of his then adoptive mother. T.Y. specifically testified that appellant threatened to ruin his adoption or to hurt someone close to T.Y. in the event that T.Y. revealed what was occurring during his sessions with appellant. In his appellate brief, appellant emphasizes that T.Y.'s adoption was legally completed at the time he had his sessions with appellant. We are not convinced that this would be a comfort to a child who had learned to view little in life as permanent. In fact, the victim's adoption was later negated. As the trial court aptly notes, T.Y. "was in social and familial purgatory. He had been a ward of the state, had been placed and adopted, and was fearful of again reentering the ranks of the homeless." Op. of Trial Court, October 19, 1989, at 30. "While the force used to overcome the will of the victim in this case was to a large extent subtle and psychological, it nonetheless satisfies the element of forcible compulsion necessary to sustain appellant's conviction for rape." *Commonwealth v. Dorman, supra,* 377 Pa.Superior Ct. at 429, 547 A.2d at 762 (citation omitted).

Appellant's next claim concerns various pretrial statements of the victim, T.Y., wherein he stated that he had suffered from uncontrollable bowel movements, and had soiled and bloodied his underwear as a result, during

the time he was meeting with the appellant for counselling sessions. The Commonwealth did not introduce this evidence in its case-in-chief; nor did the Commonwealth present any physical evidence to establish that appellant raped T.Y. Moreover, the trial court in this matter was of the opinion that "... post-incident manifestations of feces in underwear were no more relevant to proof of anal intercourse than pregnancy would be proof of rape." Op. of Trial Court, October 19, 1989, at 21. Appellant claims that he was prejudiced by the Commonwealth's decision to exclude this evidence from its case-in-chief, because appellant was rendered unable to properly impeach the credibility of T.Y. through the introduction of evidence of a contemporaneous sexual relationship between T.Y. and his adoptive brother.[6] This claim is meritless. Appellant was provided with the opportunity to impeach the credibility of T.Y. through his own testimony and the testimony of P.Y., his adoptive mother, in accordance with *Commonwealth v. Black*, 337 Pa.Super. 548, 487 A.2d 396 (1985). Appellant was permitted to introduce this testimony to attempt to establish that T.Y. harbors a specific bias and hostility toward the appellant, and a motive to seek retribution. The trial court set forth appellant's theory as follows:

> ... the victim was engaged in consensual anal intercourse with his brother. He desired to continue in that relationship. Revelation of that relationship to the defendant was embarrassing and jeopardized both the relation-

---

**6.** In *Commonwealth v. Majorana,* 503 Pa. 602, 470 A.2d 80 (1983), the Supreme Court held that where the Commonwealth introduces medical evidence relevant to establish sexual intercourse, such as the presence of semen in the victim's body, the rape shield law does not prevent the introduction of evidence to explain the presence of objective signs of intercourse. The *Majorana* Court held that the defense should have been permitted to introduce evidence to establish that the victim had engaged in consensual intercourse with a codefendant two hours before the alleged rape. *See also Commonwealth v. Lyons,* 364 Pa.Super. 620, 528 A.2d 975 (1987) (prosecution introduced evidence of child's blood-spotted panties, thus the issue of how the blood got there was made relevant and the defense was entitled to attempt to show that there was a plausible, contemporaneous alternate explanation for the condition of the panties by way of intercourse between the child and a third party on the day before or after the alleged rape by defendant).

ship and the continuation of his residence in the home. He was eventually removed from the home to an institution. As a result of that sequence of events, he harbors animosity toward the defendant, and the present charges arise from that bias and motive to falsify.

Op. of Trial Court, October 19, 1989, at 26. Appellant is entitled· to no relief on these grounds.

▪ Appellant next challenges the trial court's decision to permit the expert testimony of Dr. Pinter as a rebuttal witness. The admission or exclusion of expert testimony lies within the sound discretion of the trial court and will not be reversed on appeal absent a clear abuse of discretion. Presently, the appellant, during his direct testimony to the jury, testified in detail concerning his educational and professional background. He testified, *inter alia,* concerning his doctorate, his degree as a physician's assistant, his publications, his television appearance on a show concerning adoptions, his role as a speaker and lecturer in over thirty states, and his experience in the area of mental health and children. When questioned concerning his style of counselling, appellant testified that he would hold the children on his lap, kiss the children, and tell the children that he loved them. N.T., May 24, 1989, at 103. Appellant also testified that he performed the same physical examinations upon his therapy patients as he would have performed as "a physician's assistant in family medicine...." *Id.* at 124. Although defense counsel did not seek to have the appellant qualified as an expert witness, the trial court correctly notes that "the jury could reasonably infer that the style or methodology adopted by Frank was consonant with the level of national recognition achieved by him, authorized by texts and research, and supported by the professional community which had elevated him to a person of national prominence." Op. of Trial Court, October 19, 1989, at 34.

Dr. Pinter testified that appellant's "style of counselling" his adolescent male therapy patients, through physical affection and physical examinations, was not in compliance with any professionally acceptable mode of therapy. Dr. Pinter's testimony was relevant and not within the ordinary

knowledge, intelligence and experience of the jury. Dr. Pinter's testimony was specifically relevant to the issue of forcible compulsion:

The central issue in this instance was the "threat of forcible compulsion" as set forth in *Rhodes.* If all the preliminary maneuvers of the defendant were within the acceptable range of therapy and counseling, then the Commonwealth cannot effectively argue that they constitute the predicate steps ultimately concluding with psychological compulsion. In short, if every step concluding with the victim's dropped trousers is within normal counseling practices, then the final act arguably lacks duress or compulsion.

*Id.* at 36.

 Appellant also argues that it was error for the trial court to allow Dr. Pinter to testify as an expert concerning appellant's reputation in the community, and that a mistrial should have been granted when Dr. Pinter called the appellant a "charlatan." A review of Dr. Pinter's testimony reveals that, as to appellant's reputation in the community for honesty, truthfulness, and moral integrity, Dr. Pinter testified not as an expert, but as a community member who was aware of appellant's reputation in the community. Further, we find no error in the trial court's finding that Dr. Pinter's characterization of the appellant as a "charlatan" did not "rise to the level of creating the unavoidable effect of denying the defendant a fair trial." *Id.* at 39.

 Appellant also contends that the trial judge should have granted the defense motion for recusal. Appellant bases this claim on the fact that the trial judge reviewed the victim's Children & Youth records *in camera,* and during the course of the trial, defense counsel sought a Writ of Prohibition which was denied by the trial judge. Finally, appellant claims that the following statement in the trial judge's May 2, 1989, Opinion indicates his bias: "Further, if evidence of other offenses is excluded, the judicial system becomes an unwilling participant in assuring [appellant's]

acquittal. This is a result which we are certain that the Courts of this Commonwealth will not and do not condone." Op. of Trial Court, May 2, 1989, at 16. "It is the burden of the party asserting that a judge should be disqualified to make sufficient allegations of bias, prejudice or unfairness necessitating recusal, and a failure to do so will result in denial of the recusal motion.... If a judge rules that he or she can hear and dispose of the case fairly and without prejudice, that decision will not be disturbed on review absent an abuse of discretion." *Commonwealth v. O'Shea,* 523 Pa. 384, 408, 567 A.2d 1023, 1034 (1989) (citations omitted).

The trial judge did not abuse his discretion in failing to recuse himself in the present case. The fact that the trial judge reviewed the victim's Children & Youth records or denied a defense motion certainly does not establish bias or prejudice necessitating recusal. With respect to the language cited by the appellant from the trial judge's May 2, 1989, Opinion, we note that in an Opinion entered July 7, 1989, the trial judge notes that this language has been quoted out of context by the appellant and, further, that it evinces no bias or prejudice on the part of the trial judge:

It was never our intent to suggest any ... bias as to John Frank's guilt or innocence or as to what the jury's verdict should be. What the passage refers to is the concept that in any case, where the Commonwealth's theory is that the defendant deliberately selected victims so vulnerable as to be generically incapable of successfully pursuing a case against him and this is coupled with his use of a professional position of responsibility and trust to select and isolate the alleged victims ... it would be unjust to guarantee an acquittal by limiting evidence solely to testimony of the named victim. The result we refer to in the passage quoted is to the need to guard against potential injustice. It was never our intent to express an opinion as to what the jury verdict should be in this case. That is a matter solely for the jury's determination about which we neither express or profess an opinion. The result we refer to is the need to ensure that the trial is

fair, to both parties. This was the concept which we attempted to convey in our prior opinion. With the benefit of hindsight, the language employed may have been ill-chosen and susceptible to misinterpretation. It was, however, never intended to be intemperate or to convey the mistaken impression that this court has any bias or opinion as to what the verdict of the jury should be. Our sole concern in ruling on these motions has been to attempt to reach a conclusion that comports with the dictates of justice and the law of this Commonwealth.

Op. of Trial Court, July 7, 1989, at 23.

Finally, appellant claims that the judge abused his discretion in fashioning the sentence. Appellant alleges in his "Statement of Reasons Relied Upon for Allowance of Appeal With Respect to the Discretionary Aspects of Sentencing" that the trial court failed to consider mitigating circumstances present in this case, and that the court improperly considered evidence of other criminal acts on the part of the appellant in determining his sentence. We will consider these claims seriatim to determine whether appellant has raised a substantial question that the sentencing scheme as a whole has been violated pursuant to Pa.R.A.P. 2119(f) and *Commonwealth v. Tuladziecki*, 513 Pa. 508, 522 A.2d 17 (1987).

■ Appellant first alleges that the judge failed to consider the mitigating factors. Evidence of the mitigating circumstances was before the judge at sentencing, and an allegation that the judge failed to consider that evidence is essentially a claim that the judge failed to give that evidence the weight appellant thinks proper. Such a claim does not raise a substantial sentencing question. *Commonwealth v. Osteen*, 381 Pa.Super. 120, 127, 552 A.2d 1124, 1128 (1989). *See Commonwealth v. Devers*, 519 Pa. 88, 546 A.2d 12 (1988) (when sentencing judge has before him the presentence investigation report, he is presumed to have considered the evidence found therein).

■ Appellant's second allegation is that the judge improperly considered uncharged and unproven criminal activ-

ity in fashioning the sentence. To the contrary, the judge may consider uncharged criminal activity in determining the appropriate sentence. *Commonwealth v. Palmer*, 315 Pa. Super. 601, 614, 462 A.2d 755, 762 (1983) (citing *Commonwealth v. Vernille*, 275 Pa.Super. 263, 418 A.2d 713 (1980)). Even if this allegation were true, which is not at all clear from our reading of the record, it would not raise a substantial sentencing question. Since appellant has failed to raise a substantial question that the Sentencing Code as a whole has been violated, we deny allowance of appeal with respect to the sentencing issues. *Commonwealth v. Rogers*, 386 Pa.Super. 476, 481, 563 A.2d 165, 168 (1989) (citations omitted).[7]

For all of the foregoing reasons, we affirm the judgment of sentence.

Judgment of sentence affirmed.

7. If we reached the merits of appellant's sentencing claims, we would conclude that the trial court did not abuse its discretion. The trial court, during the sentencing proceeding, specifically stated that it was not considering the evidence presented during the trial concerning other criminal acts on the part of the appellant in formulating appellant's sentence. N.T., December 8, 1989, at 15. Appellant claims that certain statements of the trial court are indicative of the court's improper consideration of other crimes evidence for sentencing purposes. This language, when viewed in context, has been mischaracterized by the appellant. It is clear that the trial court was commenting on the nature of appellant's conduct toward the victim of the crime, T.Y., which amounted to a carefully planned and executed series of actions over a significant period of time:

> The Court is also obliged to consider the prospects of rehabilitation, which in this instance, do not appear great. The defendant has not acknowledged responsibility for error. The defendant engaged in a calculated act, a designed and premeditated selection of his victim. *The presentence report and the facts produced at trial indicate that this was not the isolated escapade of a rogue.* This was a purposeful, wretched act.

*Id.* at 19. (emphasis added). Further, appellant argues that the trial court failed to give proper consideration to mitigating factors present in this case. The trial court had before it a detailed presentence report concerning the appellant. Thus, appellant cannot claim that the trial court was unaware of the mitigating factors. Instead, appellant merely argues that the court's *conclusion*—i.e., the actual sentence imposed—was inappropriate in light of that information. We would not substitute our judgment for that of the sentencing court, and if we reached the merits of appellant's claims, we would not reverse the trial court's conclusion.